## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEREMY LEVIN
2455 E. Arlington Crescent
Birmingham, Alabama 35205
and
DR. LUCILLE LEVIN
2455 E. Arlington Crescent
Birmingham, Alabama 35205

        Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Ebe e Sina Street
Emam Khomeini Square
Tehran, Iran
and
IRANIAN MINISTRY OF INFORMATION
AND SECURITY
Pasdaran Avenue
Golestan Yekom
Tehran, Iran
and
SEYYED ALI HOSSEINI KHAMENEI
Former President of Iran
Presidential Palace
Palestine Street
Tehran, Iran
and
MOHAMMAD MOHAMMADI NIK
also known as Mohammad Reyshahri
Ministry of Foreign Affairs
Ebn e Sina Street
Emam Khomeini Square

: CASE NO. _____
:
:
:
:
:
:
:
:
: **COMPLAINT FOR:**
: **1) FALSE IMPRISONMENT**
: **2) BATTERY**
: **3) ASSAULT**
: **4) INTENTIONAL INFLICTION**
: **OF EMOTIONAL DISTRESS**
: **5) NEGLIGENCE**
: **6) LOSS OF CONSORTIUM**
:
:
:
: **DEMAND FOR JURY TRIAL**
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

05:P1523002.wpd

1

Tehran, Iran                                          :
and                                                   :
IRANIAN ISLAMIC REVOLUTIONARY                         :
GUARD CORP                                            :
Presidential Palace                                   :
Pasdaran Avenue                                       :
Tehran, Iran                                          :
                                                      :
       Defendants.                                 :

## INTRODUCTION

Plaintiffs JEREMY LEVIN and DR. LUCILLE LEVIN (hereinafter "Plaintiffs")

move for judgment against Defendants, jointly and severally, and in support of their

Complaint, allege as follows:

## JURISDICTION AND VENUE

1. Jurisdiction over the subject matter of this case arises under 28 U.S.C. §

1330(b).

2. Defendants are subject to suit in the courts of the United States pursuant to the

Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605(a)(7), and related

statutes.

3. Congress has expressly directed the retroactive application of 28 U.S.C.A.

§1605(a)(7) in order to further a comprehensive counter terrorism initiative by the

legislative branch of government.

/ / /

/ / /

05:P1523002.wpd                                2

4. Jurisdiction is further conveyed upon this Court pursuant to 28 U.S.C. § 1606, inasmuch as Defendants are not entitled to immunity under 28 U.S.C. §§ 1605 or 1607.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

6. Each count and claim set forth below is brought under 28 U.S.C. § 1605(a)(7), the Flatow Amendment, and the common law of the District of Columbia, the last place of residence of Plaintiffs prior to moving to Beirut. As this Court held in *Dammarell v. Islamic Republic of Iran*, Case No. 01-2224, 2005 WL 756090, at *22 (D.D.C. March 29, 2005), the governing law for plaintiffs living overseas in Beirut at the time of their attack should be the law of their last place of domicile.

## THE PARTIES

7. Plaintiff Jeremy Levin (hereinafter "Jerry Levin" or "Jerry") is a citizen of the United States. At all times material hereto, Jerry Levin was a resident of the District of Columbia. Jerry Levin was a victim of "torture" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note), pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1). Jerry Levin was also a victim of "hostage taking" as defined in Article 1 of the International Convention Against the Taking of Hostages, pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(2), and suffered "personal injury" as the result of Defendants' actions and activities as defined in 28 U.S.C. §§ 1605 (a)(7), as more fully set forth below.

/ / /

8.  Plaintiff Dr. Lucille Levin (hereinafter "Dr. Levin" or "Sis Levin" or "Sis") is a citizen of the United States. At all times material hereto, Dr. Levin was a resident of the District of Columbia. Dr. Levin is the wife of Plaintiff Jerry Levin, who was a victim of "torture" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note), pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1). Jerry Levin was also a victim of "hostage taking" as defined in Article 1 of the International Convention Against the Taking of Hostages, pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(2), and suffered "personal injury" as the result of Defendants' actions and activities as defined in 28 U.S.C. §§ 1605 (a)(7). Dr. Levin suffered personal injury as a result thereof as more fully set forth below.

9.  Defendant the Islamic Republic of Iran is a foreign state that has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 App. U.S.C. § 2405(j), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, since January 1984. 49 Fed. Reg. 2836-02; *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 68 (D.D.C. 1998). The Islamic Republic of Iran provided "material support and resources," as defined in 18 U.S.C. § 2339A(b), pursuant to 28 U.S.C. § 1605(a)(7), to Hizbollah, a politico-paramilitary terrorist organization operating in Lebanon. *Cicippio*, 18 F. Supp. 2d at 68. The Islamic Republic of Iran sponsors Hizbollah, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note, by providing Hizbollah with funding, training, and direction for

its terrorist activities in Lebanon, *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 110 (D.D.C. 2003), including those activities which resulted in the kidnapping, torture, and captivity of Jerry Levin.

10. Defendant the Iranian Ministry of Information and Security ("MOIS") is the Iranian intelligence service, and functions both within and beyond Iranian territory. At all times material hereto, MOIS acted as part and parcel of the Islamic Republic of Iran and, in such capacity, performed acts which caused Jerry Levin to be abducted, tortured, and held hostage. Findings of Facts and Conclusions of Law, *Cicippio-Puleo v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01496, at 11-12 ¶¶ 20-21 (hereinafter "*Cicippio-Puleo*"). As part of its operations, MOIS provided material resources and support in the form of funding, training, and direction to Hezbollah. *Id.*; *Dammarell*, 281 F. Supp. 2d at 110-11.

11. Defendant Seyyed Ali Hosseini Khamenei (hereinafter "Khamenei") served from 1981 until 1989 as the President of the Defendant Iran. While serving as President of Iran, Defendant Khamenei performed acts within the course and scope of his office which aided, abetted, facilitated, and otherwise materially assisted the abduction, hostage taking, detention, and mistreatment of Jerry Levin, as alleged below. *Cicippio*, 18 F. Supp. 2d at 68; *Cicippio-Puleo*, at 12 ¶ 25.

12. Defendant Mohammad Mohammadi Nik, also known as Mohammad Reyshahri (hereinafter "Nik"), served as the Minister of MOIS from its inception in 1983

until 1989. Defendant Nik, while serving as Minister of MOIS, performed acts within the course and scope of his office which aided, abetted, facilitated, and otherwise materially assisted the abduction, hostage taking, detention, and mistreatment of Jerry Levin, as alleged below. *Cicippio*, 18 F. Supp. 2d at 68; *Cicippio-Puleo*, at 12 ¶ 25.

13. Defendant Iranian Islamic Revolutionary Guard Corp (hereinafter "Revolutionary Guard") is a uniformed military and terrorist operations force that operated with the diplomatic and material support of the Iranian state. *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109-10 (D.D.C. 2005). The Islamic Republic of Iran trained, outfitted, and financed Hizbollah under the auspices of the Revolutionary Guard. *Id.*

## FACTUAL ALLEGATIONS

**Jerry Levin**

14. Plaintiff Jerry Levin arrived in Beirut, Lebanon in December 1983 to assume the position of Middle East Bureau Chief for Cable Network News ("CNN") and to act as a CNN correspondent.

15. At 8:15 a.m., on the morning of March 7, 1984, Ash Wednesday, Jerry Levin was kidnapped while walking to work along a street in front of the Saudi Arabian embassy. A man approached Jerry from behind, pulled a gun, and forced Jerry into the back of a car.

/ / /

16. When the car stopped, Jerry's captors blindfolded him and forced him into a small room. For hours, Jerry's captors accused him of spying for the CIA and for Israel. Jerry repeatedly denied the accusation, telling his captors he was a TV journalist and not a spy.

17. After hours of interrogation, Jerry's captors gagged him, wrapped him tightly from head-to-toe in packing tape, cutting off Jerry's circulation in his fingers and toes, and forced Jerry into the back of a truck. Jerry was transported from Beirut to the Bekaa Valley.

18. For the next 343 days, Jerry was moved among a series of prison houses. Jerry was always kept in solitary confinement and during his entire captivity, he never saw another human face. His captors required him to wear a blindfold whenever they entered the room. He was taken to a bathroom once a day. His time between showers and a change of clothes ranged from two to ten weeks. At all other times, Jerry was kept chained by his wrists to either the wall or a radiator. The chain was no more than two feet long and usually attached near the floor so that Jerry could not stand upright. For his entire captivity, Jerry could only sit or lay down on his left side, causing his shoulder, back, and leg muscles to cramp horribly. The rooms were always bare and the windows were always covered. Jerry was told not to try to look out the window or at his captors, or he would be killed.

/ / /

05:P1523002.wpd

7

19. Jerry was threatened, starved, and tortured by his captors. One of his captors repeatedly pressed a pistol under Jerry's blindfold, so that Jerry could see the gun barrel, and then fired the weapon. Unknown to Jerry at the time, the gun was never loaded. Another captor jumped up and down on Jerry's legs. Other captors slapped Jerry.

20. After two months in captivity, Jerry heard other people in the hallway being led to the bathroom. When Jerry heard one of the guards speak English, he realized that there were other Americans being held with him. Jerry later learned that these Americans were Benjamin Weir and William Buckley. Later, Peter Kilburn and Father Lawrence Martin Jenco were also captured and held in the house with Jerry, although Jerry was always kept in solitary confinement. Several of these hostages have recovered compensation or have actions against Defendants. *See Weir v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01303; *Kilburn v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01301; *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 40 (D.D.C. 2001).

21. Jerry was deprived of food for the duration of his captivity, subsisting almost entirely on a meager diet of bread, cheese, and water. As a result of this deprivation, Jerry suffered drastic and debilitating weight loss. After nearly four months in captivity, Jerry became critically ill, suffering intense abdominal pains and diarrhea.

22. While he was ill, Jerry's captors brought him to another room. Jerry was told to take his blindfold off and look straight ahead. He was staring into a video-camera lens. He was ordered to read from a piece of paper. "I am Jeremy Levin," Jerry recited. "My

life and freedom depend on the life and freedom of the prisoners in Kuwait." The videotape was sent to the U.S. State Department and was later viewed by Jerry's wife, Dr. Levin, causing her extreme pain, suffering, and agony.

23. Jerry's illness went untreated for weeks and he was near death before the guards finally brought him a doctor. The doctor told Jerry that he would give him some medicine. The medicine never came and Jerry's condition worsened. Several days later, the doctor was brought back and learned that Jerry was never given the medicine. The doctor yelled at the guards in Arabic and Jerry was finally given medicine. It was weeks before Jerry began to improve. In fact, Jerry had contracted hepatitis.

24. Jerry also developed a severe ear infection in both ears early in his captivity, which went untreated. After his release, Jerry had to undergo several operations on his ears, and was left with permanent damage to his hearing and tintinitis, which is a constant ringing, roaring, or buzzing sound in the ears. He wears hearing aids, but his hearing is severely impaired.

25. During his captivity, the weather became extremely cold and the small room he was kept in had no heat.

26. Jerry nearly died from the cold.

27. On February 14, 1985, Valentine's Day, and after 343 days in captivity, one of the guards carelessly secured Jerry's chains. Jerry was able to slip out of his chains and climb out of a second story window. Running barefoot over stony, thorny ground in the

middle of the night for over two hours, Jerry finally fell into the hands of the Syrian Army, which turned him over to the U.S. Ambassador to Syria, William Eagleton.

28. Jerry's captors were members of Hizbollah, a politico-paramilitary group funded by the Islamic Republic of Iran, the MOIS, and the Revolutionary Guard. They were responsible for carrying out acts of terrorism in Lebanon. Hizbollah could not have taken Jerry Levin hostage without approval from the highest levels of the Iranian government, including then-acting President of Iran, Defendant Kamenei; and then-acting Minister of the MOIS, Defendant Nik. *Cicippio*, 18 F. Supp. 2d at 68; *Cicippio-Puleo*, at 12 ¶ 25.

29. Throughout Jerry's captivity, funds in excess of $200,000 were drawn from the savings of both Jerry and his wife, Dr. Levin, and were spent trying to secure Jerry's release. In addition, CNN spent nearly $500,000 trying to secure Jerry's release. Despite these efforts and payments, Jerry was not released. Other captives held in the same circumstances later died at the hands of the Hizbollah.

30. Since his escape, Jerry Levin has continued to suffer the physical and psychological effects of his confinement. Jerry has had four operations on his ears over the last 20 years, has lost most of his hearing, and suffers from tintinitis. He has also had regular psychotherapy treatment since his release. Jerry's past and future medical expenses over the last 20 years and for his expected life exceed $1,000,000.

///

05:P1523002.wpd

10

31. Jerry's career as an established news correspondent also suffered because of his capture. At the time he was taken hostage, Jerry was a Bureau Chief and correspondent for CCN and on track to advance at CNN. Jerry had been Bureau Chief in Chicago and Washington D.C. before CCN's president, Burt Reinhardt, asked him to go to the Beirut Bureau. Mr. Reinhardt asked Jerry to go to Beirut to solve serious problems at the Bureau, including possible corruption. After his release, Jerry continued to have health problems. CNN kept Jerry on the payroll for sometime but he was never advanced, and eventually he was let go. Jerry was able to work intermittently thereafter, but his career as a journalist for a major broadcaster was over. Jerry has past and future earnings losses of at least $2,500,000.

**Sis Levin**

32. Dr. Levin, known as "Sis," was living with her husband, Jerry, in Beirut at the time he was kidnapped.

33. On March 7, 1984, Sis arrived at Jerry's office for a lunch date only to learn that Jerry was missing and that he had never arrived at CNN that morning. Torn with anxiety, grief, and fear for the life of her husband and herself, and far from family and friends, she sought information about Jerry. She was in personal danger as she went around Beirut asking literally anyone who would listen, where her husband was. Sis even went to Nabih Berri, the leader of Amal, a Shiite political faction that was in control of Western Beirut, begging for the life of her husband.

34. In truth, Sis did not know whether Jerry was alive or dead. Since it was possible he was alive, she could not mourn him, but lived in a nightmare world, caught between hope and despair.

35. In April 1984, a Lebanese-American friend learned through his contacts that Jerry was being held by a sect of the militant Shiite radical group, Hizbollah. Jerry, and other American hostages, were being held to exchange for 17 Shiite prisoners convicted in Kuwait for bombing the U.S. and French embassies there.

36. Over the next five months, using her own funds, Sis traveled from Beirut to Cyprus to the United States. She, along with members of her family and several close friends, worked around the clock, calling everyone they knew with connections in the Middle East, in an effort to obtain information about where Jerry was being held and by whom, so they could try to negotiate for his release.

37. In June 1984, Sis learned that the Kuwaitis set a date for the execution of the Lebanese prisoners; the same prisoners that the Hizbollah kidnappers wanted to exchange for Jerry and the other American hostages. Sis was horrified and panicked. The media reported that Hizbollah promised to execute the American hostages if the Kuwaiti government executed the Lebanese prisoners. Sis knew that if the execution went forward, Jerry would be killed. Sis suffered through the entire day and night, wondering if her husband would be killed. It was not until the next morning that she learned her

/ / /

connections made contact with the Kuwaitis and that the Kuwaitis had agreed to stay the execution of the Lebanese prisoners.

38. In July 1984, Sis received a call from the State Department. They had received a videotape of Jerry, and Sis was allowed to view it. As Sis watched, she did not recognize the figure in the videotape. He was bearded and haggard, and his voice was soft and weak. Sis was filled with anguish and anxiety as she listened to Jerry say that his life and freedom depended on the life and freedom of the prisoners of Kuwait.

39. Sis tried any avenue to obtain Jerry's release and was taken advantage of by con artists, who promised they could obtain Jerry's release if Sis would pay them. Sis and her family gave over $200,000 to such con men, who took the money and did nothing to help Jerry.

40. Through her personal campaign for Jerry's release, Sis sought out officials, royalty, and scholars around the world. Some joined Sis' cause and contributed their time, money, and connections to fight for Jerry's freedom. The list includes Texas billionaire Ross Perot; the Reverend Jesse Jackson; Landrum Bolling, President of the Ecumenical Institute, a research and study center operated by the University of Notre Dame in Jerusalem; Princess Dina, the first wife of Jordan's King Hussein; and the U.S. Ambassador to Syria, William Eagleton.

41. In November 1984, Sis to traveled to Damascus, Syria to meet with the President of Syria, Hafez Assad. Syrian troops had a presence in the Bekaa Valley, where

it was rumored Jerry was being held. Sis was granted an audience with Farouk al Sharaa, the Syrian Foreign Minister.

42. Sis remained in Syria over the next month, from November 1984 through December 1984. During this time, she met with the Foreign Minister on several more occasions. Princess Dina also set up several meetings for Sis with anonymous strangers that simply show up and knock on Sis' door. But there is no real evidence that anything was going to result in Jerry's release.

43. Feeling defeated and alone, Sis returned to the United States on Christmas Eve to see her sick mother, but she continued her efforts to help all the hostages, not just Jerry. In late January 1985, Sis received a mysterious message from a friend in Syria, giving some hope that Jerry might be released. This had happened before, and the false hope and disappointment were mind numbingly painful.

44. At 5:00 a.m., on February 14, 1985, Valentine's Day, Sis received a call. Jerry had escaped. Whether due to her efforts and those of the international community that she enlisted, no one may ever know.

45. At all times material hereto, Sis suffered extreme and immediate shock from the facts and circumstances of her husband's kidnapping and captivity as the result of seeing news reports about his kidnapping and captivity on television, including but not limited to those containing threats upon his life made by his captors and videotaped images of him in obvious conditions of extreme physical, psychological, and emotional

stress and trauma. As a result, Dr. Levin was constructively present at the times and places of, and thus constructively witnessed, these horrific events.

46. Since Jerry's release, Dr. Levin has had to help her husband cope with the physical and psychological trauma of his captivity. In addition, Dr. Levin herself has had regular psychotherapy treatment since Jerry's release. Dr. Levin's past and future medical expenses over the last 20 years and for her expected life exceed $500,000.

**Defendants**

47. This Court, in numerous opinions, including *Cicippio v. The Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998), has held that the Islamic Republic of Iran is liable to victims of state sponsored terrorism, particularly terrorist acts committed in Lebanon, Israel, and Gaza.

48. At all times material hereto, the Islamic Republic of Iran, through its agents MOIS, Nik, Khamenei, and Revolutionary Guard, provided material resources and support, in the form of funding, training, and direction, to Hizbollah. In providing said material resources and support, MOIS, Nik, Khamenei, and the Revolutionary Guard were acting within the scope of their agency. *See Cicippio*, 18 F. Supp. 2d at 64. The Islamic Republic of Iran provided and continues to provide protection and support to Imad Mugneiha, the leader of Hizbollah in Lebanon, and the man that ordered Jerry's capture.

/ / /

49. The willful, wrongful, intentional, and reckless acts of Hizbollah members, whose activities were funded and directed by the Islamic Republic of Iran through its agents MOIS, Nik, Khamenei, and Revolutionary Guard, are acts for which officials of the U.S. Government would be liable had it committed the same acts against U.S. citizens.

## COUNT I

## PLAINTIFF JEREMY LEVIN v. ALL DEFENDANTS

### FALSE IMPRISONMENT

50. Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

51. On March 7, 1984, and for 343 days thereafter, members of Hizbollah intentionally and unlawfully used force and the threat of force to restrain, detain, and confine Plaintiff Jerry Levin.

52. At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68. Hizbollah's restraint, detention, and confinement of Plaintiff Jerry Levin could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

53. The restraint, detention, and confinement of Plaintiff Jerry Levin lasted for 343 days, during which time Plaintiff Jerry Levin was held in a small room and chained

by his wrist to a radiator or the wall. The chains were removed once a day, at which time Jerry Levin was escorted at gunpoint to the bathroom.

54. Plaintiff Jerry Levin did not consent to the restraint, detention, and confinement; he was held for 343 days against his will.

55. The restraint, detention, and confinement caused and continues to cause Plaintiff Jerry Levin to suffer significant personal injury, harm, and economic losses.

## COUNT II

### PLAINTIFF JEREMY LEVIN v. ALL DEFENDANTS

### BATTERY

56. Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

57. While holding Plaintiff Jerry Levin captive for 343 days, members of Hizbollah did acts with the intent to cause harmful and offensive contact to Plaintiff Jerry Levin's person.

58. These acts did result in harmful and offensive contact to Plaintiff Jerry Levin's person.

59. At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68. Hizbollah's

/ / /

05:P1523002.wpd                                17

harmful and offensive contact to Plaintiff Jerry Levin's person could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

60. Plaintiff Jerry Levin did not consent to the contact.

61. The harmful and offensive contact caused and continues to cause Plaintiff Jerry Levin to suffer significant personal injury, harm, and economic losses.

## COUNT III

## PLAINTIFF JEREMY LEVIN v. ALL DEFENDANTS

### ASSAULT

62. Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

63. While holding Plaintiff Jerry Levin captive for 343 days, members of Hizbollah did intentionally and unlawfully threaten to touch Plaintiff Jerry Levin in a harmful and offensive manner. These threats included displays of force.

64. At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68. Hizbollah's threats to touch Plaintiff Jerry Levin in a harmful and offensive manner could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

65. It reasonably appeared to Plaintiff Jerry Levin that his captors were able to and were about to touch Plaintiff Jerry Levin in a harmful and offensive manner.

66.  Plaintiff Jerry Levin did not consent to the conduct or threats.

67.  Defendants' conduct was a substantial factor in causing Plaintiff Jerry Levin's personal injury, harm, and economic losses.

68.  The threats caused and continues to cause Plaintiff Jerry Levin to suffer significant personal injury, harm, and economic losses.

## COUNT IV

### PLAINTIFF JEREMY LEVIN v. ALL DEFENDANTS

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

69.  Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

70.  While holding Plaintiff Jerry Levin captive for 343 days, members of Hizbollah engaged in extreme and outrageous conduct.

71.  Such conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and is to be regarded as atrocious and utterly intolerable in a civilized community.

72.  At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68. Hizbollah's extreme and outrageous conduct could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

73. Defendants and Hizbollah intended to cause Plaintiff Jerry Levin severe emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiff Jerry Levin severe emotional distress.

74. Plaintiff Jerry Levin suffered and continues to suffer severe emotional distress caused by Defendants' and Hizbollah's extreme and outrageous conduct.

## COUNT V

## PLAINTIFF JEREMY LEVIN v. ALL DEFENDANTS

### NEGLIGENCE

75. Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

76. Hizbollah held Plaintiff Jerry Levin against his will for 343 days. During his time in captivity, Hizbollah owed Plaintiff Jerry Levin a duty of care, including, but not limited to, treating Plaintiff Jerry Levin humanely and providing him with necessary food, shelter, and medical attention.

77. Hizbollah breached the duty of care it owed to Plaintiff Jerry Levin. For example, members of Hizbollah withheld vital medication, causing Plaintiff Jerry Levin to suffer for weeks with severe stomach cramps and diarrhea, and almost die.

78. At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68. Hizbollah's

breach of duty to Plaintiff Jerry Levin could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

79.  The breach of duty caused and continues to cause Plaintiff Jerry Levin to suffer significant personal injury, harm, and economic losses.

**COUNT VI**

**PLAINTIFF JEREMY LEVIN v. ALL DEFENDANTS**

**LOSS OF CONSORTIUM**

80.  Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

81.  The intentional and wrongful acts of Hizbollah members caused Plaintiff Dr. Lucille Levin to suffer extreme personal injury, both physical and emotional, as set forth in detail herein.

82.  At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68.  Hizbollah's intentional and wrongful acts against Plaintiff Dr. Levin could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

83.  Defendants' and Hizbollah's intentional and wrongful acts caused and continue to cause Plaintiff Jerry Levin to suffer the loss of love, companionship, comfort, affection, society, solace, and moral support of his wife, Plaintiff Dr. Levin.

84. Plaintiff Jerry Levin suffered and continues to suffer these losses since his escape on February 14, 1985.

## COUNT VII

### PLAINTIFF DR. LUCILLE LEVIN v. ALL DEFENDANTS

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85. Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

86. This Court has found that when an organization, including Hizbollah, takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family. *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 50 (D.D.C. 2001); *Cicippio-Puleo*, at 24 ¶ 24. This Court further found that an organization, including Hizbollah, taking someone hostage implicitly believes that such emotional distress is substantially certain to result. *Sutherland*, 151 F. Supp. 2d at 50. Finally, this Court found that even if an organization, including Hizbollah, did not fully intend to cause the immediate family emotional distress, that by taking someone hostage the organization recklessly causes emotional distress to the immediate family members and is therefore liable for such emotional distress. *Id.*

87. While holding Plaintiff Jerry Levin captive, members of Hizbollah engaged in extreme and outrageous conduct directed at members of Plaintiff Jerry Levin's immediate family, particularly his wife, Plaintiff Dr. Lucille Levin.

88. Such conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and is to be regarded as atrocious and utterly intolerable in a civilized community.

89. At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68. Hizbollah's extreme and outrageous conduct could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

90. Defendants and Hizbollah intended to cause Plaintiff Dr. Lucille Levin severe emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiff Dr. Levin severe emotional distress. *Sutherland*, 151 F. Supp. 2d at 50.

91. Plaintiff Dr. Lucille Levin did suffer and continues to suffer severe emotional distress caused by Defendants' and Hizbollah's extreme and outrageous conduct.

## COUNT VIII

## PLAINTIFF DR. LUCILLE LEVIN v. ALL DEFENDANTS

### LOSS OF CONSORTIUM

92. Plaintiffs incorporate by reference and reassert all allegations of the foregoing paragraphs as though fully set forth herein.

/ / /

/ / /

93. The intentional and wrongful acts of Hizbollah members caused Plaintiff Jerry Levin to suffer extreme personal injury, both physical and emotional, as set forth in detail above.

94. At all times material hereto, Defendant, the Islamic Republic of Iran, through its agents, Defendants MOIS, Nik, Khamenei, and Revolutionary Guard, sponsored, financed, and controlled Hizbollah. *See Cicippio*, 18 F. Supp. 2d at 68. Hizbollah's intentional and wrongful acts against Plaintiff Jerry Levin could not have occurred without approval from Defendants. *Id.*; *Cicippio-Puleo*, at 12 ¶ 25.

95. Defendants' and Hizbollah's intentional and wrongful acts caused and continue to cause Plaintiff Dr. Levin to suffer the loss of love, companionship, comfort, affection, society, solace, and moral support of her husband, Plaintiff Jerry Levin.

96. Plaintiff Dr. Levin suffered these losses during the 343 days of her husband's captivity, and has continued to suffer these losses even after her husband's return.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. For compensatory damages in the amount of Twenty Five Million Dollars ($25,000,000) for Plaintiff Jeremy Levin's economic losses, personal injury, pain and suffering, extreme emotional distress, and loss of society; and Fifteen Million Dollars

/ / /

($15,000,000) for Plaintiff Dr. Lucille Levin's economic losses, personal injury, pain and suffering, extreme emotional distress, and loss of society.

2. For punitive damages against Defendants Nik, Khamenei, and the Revolutionary Guard, according to proof;

3. For costs of suit, including attorneys' fees; and

4. For such other and further relief as the Court may deem proper.

DATED: December 29, 2005        Respectfully submitted,

Suzelle M. Smith
D.C. Bar No. 376384
Howarth & Smith
523 West Sixth Street, Suite 728
Los Angeles, California 90014
213-955-9400
Fax: 213-622-0791
Attorney for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury herein.

DATED: December 29, 2005        Respectfully submitted,

Suzelle M. Smith
D.C. Bar No. 376384
Howarth & Smith
523 West Sixth Street, Suite 728
Los Angeles, California 90014
213-955-9400
Fax: 213-622-0791
Attorney for Plaintiffs

05:P1523002.wpd                    25