## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEREMY LEVIN and DR. LUCILLE LEVIN, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : CASE NO. 1:05-CV-02494-GK |
| | : |
| ISLAMIC REPUBLIC OF IRAN; IRANIAN | : |
| MINISTRY OF INFORMATION AND | : |
| SECURITY; SEYYED ALI HOSSEINI | : |
| KHAMENEI; MOHAMMAD | : |
| MOHAMMADI NIK; and IRANIAN ISLAMIC | : |
| REVOLUTIONARY GUARD CORP, | : |
| | : |
| Defendants. | : |

## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Plaintiffs Jeremy Levin ("Jerry Levin" or "Mr. Levin") and Dr. Lucille

Levin ("Sis Levin" or "Dr. Levin") respectfully move pursuant to Rule 55(b) of

the Federal Rules of Civil Procedure for a default judgment against Defendants the

Islamic Republic of Iran ("Iran"), the Iranian Revolutionary Guard Corps

("IRGC"), and the Iranian Ministry of Information and Security ("MOIS"), jointly

and severally, in the amount of Twenty-Five Million Dollars ($25,000,000) for Mr.

Levin and Fifteen Million Dollars ($15,000,000) for Dr. Levin, for compensatory

damages arising out of the kidnapping, torture, and imprisonment of Mr. Levin in

Beirut, Lebanon from March 8, 1984, to February 14, 1985.

/ / /

Default judgment is appropriate at this time under Federal Rule of Civil Procedure 55(b)(2). On June 26, 2006, Plaintiffs served Defendants pursuant to the requirements of 28 U.S.C. § 1608 (a)(3) and (a)(4). Pursuant to 28 U.S.C. § 1608(c) and (d), Defendants had sixty (60) days from June 26, 2006, or until August 25, 2006, in which to answer or make some other responsive pleading. Defendants failed to answer or otherwise appear by August 25, 2006. Accordingly, on August 29, 2006, the Clerk of the Court declared Defendants Iran, MOIS, and the IRGC in default. Entry of Default, dated Aug. 29, 2006, attached as Exhibit A to the Declaration of Suzelle M. Smith Filed in Support of Plaintiffs' Motion for Default Judgment ("Smith Decl.").

Because Plaintiffs are seeking a default judgment against a foreign state, 28 U.S.C. § 1608(e) requires that Plaintiffs establish their right to relief by "evidence satisfactory to the court." In other FSIA and terrorist cases, this and other Courts have allowed evidence to be presented in the form of documents and affidavits alone, rather than requiring plaintiffs to go through the expense of a hearing with live witnesses. *See, e.g., Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 21 (2001); *Haim v. Islamic Republic of Iran*, 425 F. Supp 56, 59-60 (D.D.C. 2006); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 n.1 (D.D.C. 2003); *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 111 (6th Cir. 1995) ("Use of affidavits in granting default judgments does not violate either due process or the FSIA."). In this case, both Mr. Levin and Dr. Levin have serious health problems and are currently under medical treatment and no longer live in Washington, D.C.

It would be a significant burden to them to travel to Washington for a live hearing, and Plaintiffs ask the court to also take this into consideration. *See* Declaration of Suzelle Smith ¶ 3. In support of Plaintiffs' Motion for Default Judgment, Plaintiffs submit affidavits and documents, which are attached to the Declaration of Suzelle M. Smith, filed concurrently with this Motion. If for any reason the Court does not grant Plaintiffs' Motion for Default Judgment, Plaintiffs request that the Court give Plaintiffs further direction and an opportunity to supplement their Motion with further affidavits, documentary evidence, and/or live testimony as the Court may direct.

Dated: December 12, 2006                Respectfully submitted,

                                        /s/ Suzelle M. Smith
                                        Suzelle M. Smith
                                        D.C. Bar No. 376384
                                        Howarth & Smith
                                        523 West Sixth Street, Suite 728
                                        Los Angeles, California 90014
                                        Phone: 213-955-9400
                                        Fax: 213-622-0791

                                        Attorney for Plaintiffs

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   FACTUAL BACKGROUND

### A.   MR. LEVIN

In December 1983, Plaintiff Jerry Levin was employed by CCN as Bureau

Chief and correspondent in its Beirut office in Lebanon.  Jerry Levin Affidavit ¶ 5

(Ex. B to Smith Decl.).  His wife, Plaintiff Dr. Levin, joined him shortly thereafter

on January 22, 1984.  Dr. Levin Affidavit ¶ 1 (Ex. C to the Smith Decl.).

On March 7, 1984, Ash Wednesday, Mr. Levin was kidnapped on the street

in Beirut while walking from his apartment to work.  Jerry Levin Affidavit ¶ 6.  A

gun was shoved at his waist, and he was forced into a car and threatened with

death should he open his eyes.  *Id.* ¶¶ 6-7.  He was blindfolded, beaten, and

interrogated at a local apartment before being gagged and wrapped from head to

foot in packing tape, placed in the back of a truck, and driven out of Beirut into the

Bekaa Valley.  *Id.* ¶¶ 8-12.

In the Bekaa Valley, Mr. Levin was held in a tiny, unheated room and

chained to the wall.  *Id.* ¶¶ 13-17.  Mr. Levin was severely restricted by the length

of the chain, which was short and attached low to the wall, preventing Mr. Levin

from being able to stand up.  *Id.* ¶ 14.  Throughout his captivity, Mr. Levin was

moved among several different safe houses, but each time he was held in a small,

unheated room, and always kept chained to the wall.  *Id.*   He was also kept in

solitary confinement and forced to wear a blindfold whenever his captors entered

/ / /

the room. *Id.* ¶¶ 19, 28.  During the entire 343 days of his kidnapping, Mr. Levin never saw another human face.

Over the course of the eleven months he was held hostage, Mr. Levin's captors beat him, mocked him continuously, and threatened him with imminent death. *Id.* ¶¶ 18-20.  His captors jumped on his legs, slapped him, and told him they were going to kill him. *Id.* ¶¶ 18-20.  His captors would emphasize their threats by shoving the barrel of a gun under Mr. Levin's blindfold where he could see it and pulling the trigger so that Mr. Levin could hear the hammer click on an empty chamber. *Id.* ¶ 20.  Eventually, Mr. Levin's kidnappers told him they belonged to the paramilitary group Hizbollah.[1] *Id.* ¶ 30.

Mr. Levin's captors deprived him of food and the most basic hygienic care. *Id.* ¶¶ 21-22.  He was only allowed to use the toilet once a day, and was watched and mocked by his captors while he used the restroom. *Id.* ¶ 19.  In his first three months of captivity, Mr. Levin was only allowed one shower and one change of clothes. *Id.* ¶ 22.  Mr. Levin's room was unheated and he nearly froze to death during cold nights and the brutal winter. *Id.* ¶ 17.

Mr. Levin developed several life-threatening illnesses as a direct result of his poor living conditions, hygiene, and diet, including hepatitis and a severe ear infection that left him nearly deaf in both ears. *Id.* ¶¶ 23-27, 49-51.  When he contracted hepatitis, Mr. Levin became critically ill, suffering from severe

---

[1] "There does not appear to be a consensus on the spelling of 'Hizbollah', as it is often spelled 'Hezbollah' as well." *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 46 n.5 (D.D.C. 2001).  It is also spelled "Hizballah."

abdominal pain, diarrhea, and nausea. *Id.* ¶ 23. Eventually, his captors brought in a doctor to examine him. *Id.* ¶ 23. Although the doctor left medication to treat Mr. Levin's symptoms, his captors withheld the medication, and Mr. Levin's condition worsened. *Id.* ¶ 23. Days later, after Mr. Levin had fouled his bed, his captors brought the doctor back and Mr. Levin was finally given medicine. *Id.* ¶¶ 24-25.

In July 1984, while he was still ill, Mr. Levin's captors forced him into a room and ordered him to read a pre-written statement, which was videotaped and sent to the U.S. Department of State. *Id.* ¶ 32. The statement as read by Mr. Levin was that unless the Kuwaiti government released 17 terrorists who had been convicted and sentenced to death for the bombing of the U.S. and French Embassies in Kuwait in December 1983, Mr. Levin would be killed. *Id.* ¶ 32. Mr. Levin believed that his captors would go through with their threat and kill him if their demands were not met. *Id.* ¶ 34. This led to panic, terror, and a certainty that he was doomed, considering the improbability of the Kuwaiti government bowing to Hizbollah's demands. *Id.* ¶¶ 34-35.

During the time that Mr. Levin was held, Hizbollah was engaged in a systematic kidnapping program under the supervision of Iran. Clawson Affidavit ¶¶ 15, 19-20 (Ex. D to Smith Decl.). Several other Americans had been kidnapped and were being held hostage by Hizbollah, including Benjamin Weir, Peter Kilburn, Lawrence Martin Jenco, and CIA station chief William Buckley. *Id.* ¶ 19. For at least some period of time, these fellow Americans were held in the same place as Mr. Levin. Jerry Levin Affidavit ¶¶ 28-29, 33, 38, 48. Mr. Levin heard

them being taken to and from their cells, and heard his captors give them orders in English, so Mr. Levin knew that they were Americans. *Id.* ¶ 28, 38. Several of these captives and their families have recovered in cases before this Court. For example, the estate of William Buckley received a judgment of $6.5 million; Mr. Buckley's longtime companion, Ms. Beverly Surette, received $10 million; and Mr. Buckley's sister received $2.5 million. *Surette v. Islamic Republic of Iran,* 231 F. Supp. 2d 260, 274 (2002). Also, Father Jenco received a judgment of $5.6 million, each of his four siblings received $1.5 million, and the Court awarded $300 million in punitive damages to Father Jenco and his family. *Jenco v. Islamic Republic of Iran,* 154 F. Supp. 2d 27, 39-40 (2001).

On February 14, 1985, Valentine's Day, Mr. Levin escaped. Jerry Levin Affidavit ¶ 39. He was able to work free of his chains, climb out of the small window in his cell, and scramble barefoot down a rocky hillside, without his glasses and clad in the scanty clothing his captors allowed him. *Id.* ¶¶ 39-44. At the foot of the hill, he was discovered by Syrian soldiers, who eventually handed him over to U.S. authorities. *Id.* ¶¶ 45-48.

Although he attained his freedom from Hizbollah, Jerry Levin continues to suffer the effects of his torture, deprivation, and the illnesses contracted during his captivity. *Id.* ¶¶ 49-52. As a result of the severe ear infections, Mr. Levin is almost completely deaf in both ears and has to wear hearing aids in both ears. *Id.* ¶ 27. He has also had three complete eardrum replacement surgeries and three separate procedures to have drainage tubes inserted into his ears. *Id.* ¶ 49. Since

his release, Mr. Levin has had to see an ear doctor regularly and requires frequent antibiotic treatments. *Id.* ¶ 49. In addition, Mr. Levin has sought the help of psychological professionals in order to cope with the stress and trauma of his kidnapping. *Id.* ¶ 51. In total, Mr. Levin estimates that cost of his past and future medical expenses exceed $200,000. *Id.* ¶¶ 49-51. Mr. Levin has also been damaged professionally as a result of his being held hostage. After his release, Mr. Levin was never again promoted at CNN, and eventually CNN let him go. *Id.* ¶ 52. His career as a major broadcast journalist was essentially over. *Id.* Mr. Levin estimates that his loss of past and future earnings is about $2.9 million. *Id.*

### B.   DR. LEVIN

Dr. Levin was in Beirut when her husband was kidnapped. Dr. Levin Affidavit ¶ 1 (Ex. C to Smith Decl.). She told him good-bye in the morning and had a date to meet him for lunch. *Id.* ¶ 3. He never showed up. *Id.* When Dr. Levin learned of her husband's kidnapping, she was devastated, depressed, and terrified, and filled with anxiety and grief. *Id.* She did not know whether her husband was dead or alive, and she was living in a foreign country in the middle of a Civil War where she did not know anyone or speak the language. *Id.* She feared for both her husband and for herself. *Id.* ¶¶ 3-4. Despite her fear, during the entire 343 days of Mr. Levin's captivity, Dr. Levin worked tirelessly to gain information about where Mr. Levin was being held and who was holding him. *Id.* ¶ 4; Bolling Affidavit ¶¶ 5-6 (Ex. E to Smith Decl.). She depleted the family savings traveling to seek help and garner support, and paying informants for any

bit of information about Mr. Levin's whereabouts and to secure his release. Dr. Levin Affidavit ¶ 5 (Ex. C to Smith Decl); Bolling Affidavit ¶¶ 6-7 (Ex. E to Smith Decl.).

Dr. Levin's fears and anxieties only increased when she found out the identity of Mr. Levin's captors, Hizabollah. Dr. Levin Affidavit ¶¶ 6-7 (Ex. C to Smith Decl.). Dr. Levin learned that Hizbollah was threatening to kill the American hostages unless 17 Shiite prisoners in Kuwait were immediately released. *Id.* ¶ 6. Then, in June 1984, Dr. Levin learned from the U.S. State Department that the Kuwaiti government had set a date for the execution of the Shiite prisoners. *Id.* ¶ 7. She was absolutely terrified that her husband would be killed and worked frantically with friends and family to get in touch with the Kuwaiti government. *Id.* The State Department told her that the Kuwaiti government had never before stayed an execution. *Id.* Despite this, after many sleepless nights, the impossible was accomplished, and the Kuwaiti government agreed to stay the prisoners' execution. *Id.*

In July 1984, Dr. Levin received a call from the State Department; they had received a videotape from Mr. Levin's captors and Mr. Levin was in it. *Id.* ¶ 8. When Dr. Levin watched the video, she saw her husband, looking tired, weak, severely ill, and desperately thin. *Id.* She heard him say that his life was dependent on the lives of several prisoners in Kuwait. *Id.* Dr. Levin was filled with anguish, terror, and anxiety. *Id.*

/ / /

Dr. Levin redoubled her efforts to obtain Mr. Levin's release. *Id.* ¶ 9. She contacted and met with foreign dignitaries and officials, such as Ross Perot, Jesse Jackson, Princess Dina of Jordan, and Syrian Foreign Minister Farouk al Sharaa. *Id.* ¶¶ 9-10; Bolling Affidavit ¶¶ 8-18 (Ex. E to Smith Decl.). Despite her efforts, Dr. Levin became steadily more depressed, desperate, anxious, exhausted, and terrified that she would never see her husband again. Dr. Levin Affidavit ¶ 10 (Ex. C to Smith Decl.). Throughout the next months, Dr. Levin endured a continuous cycle of false hope followed by severe disappointment, and she finally sought out psychological help. *Id.* ¶¶ 10-11. After her husband's release, Dr. Levin has had to continue receiving regular, professional psychological care, including medication, to help her deal with the trauma of her and her husband's ordeal. *Id.* ¶¶13-18. She has been diagnosed with Reacting Clinical Depression. *Id.* ¶14. In addition, both Mr. and Dr. Levin have had to see a marriage counselor to deal with the stress that Mr. Levin's kidnapping and subsequent illnesses have placed on their marriage. *Id.* ¶ 16. Dr. Levin estimates that the cost for her past and future medical expenses is about $400,000. *Id.* ¶¶ 14-19.

## II.    PROCEDURAL HISTORY

On December 30, 2005, Plaintiffs filed the Complaint in this matter against the Islamic Republic of Iran, the MOIS, the IRGC, Seyyed Ali Hosseini Khamenei, and Mohammad Mohammadi Nik. *See* Complaint (Ex. F to the Smith Decl.).

Plaintiffs attempted service on all Defendants pursuant to 28 U.S.C. § 1608(a)(3) and (b)(3) by providing the Clerk of the Court with the requisite copies

of the Summons, Complaint, and Notice for Suit, each translated into Farsi, for

service on the Defendants. *See* Affidavit of Jennifer C. Davis in Support of

Default, dated Aug. 28, 2006 ¶ 2 (Ex. G to Smith Decl.).  The Clerk of the Court

received Plaintiffs' request for foreign service on January 19, 2006. *Id.*  The Clerk

then dispatched the prepared documents, together with their translations, by

registered international mail on February 28, 2006. *Id.*

Plaintiffs attempted service a second time on Defendants Iran, MOIS, and

the IRGC pursuant to 28 U.S.C. § 1608(a)(4).  On April 6, 2006, Plaintiffs

requested service on Defendants through diplomatic channels, and provided the

Clerk of the Court with the requisite copies of the Summons, Complaint, and

Notice for Suit, each translated into Farsi, for service on Defendants Iran, MOIS,

and the IRGC. *Id.* ¶ 3.  On April 14, 2006, the Clerk of the Court dispatched these

documents to the U.S. Department of State for service through diplomatic

channels. *Id.*  On June 26, 2006, the U.S. Interests Section of the Embassy of

Switzerland in Tehran, which had received Plaintiffs' Summons, Complaint, and

Notice for Suit from the U.S. Department of State, served those documents on

Defendants Iran, MOIS, and the IRGC pursuant to 28 U.S.C. § 1608(a)(4). *Id.*

Pursuant to 28 U.S.C. § 1608(c) and (d), Defendants Iran, MOIS and the

IRGC had sixty (60) days from June 26, 2006, or until August 25, 2006, in which

to answer or make some other type of responsive pleading. *Id.* ¶ 4.  Defendants

did not and to date have not made an appearance, or filed an answer or other

responsive pleading. *Id.* ¶ 3.  On August 29, 2006, the Clerk of the Court entered

default against Defendants Iran, MOIS, and the IRGC in default. Entry of Default, dated Aug. 29, 2006 (Ex. A to Smith Decl.).

Plaintiffs have complied with the service requirements of the Foreign Sovereign Immunities Act ("FSIA") set forth in 28 U.S.C. § 1608. Plaintiffs now move, pursuant to Federal Rule of Civil Procedure 55(b)(2), for a default judgment against each Defendants the Islamic Republic of Iran, the MOIS, and the IRGC, jointly and severally, in the amount of $25,000,000 for Plaintiff Jeremy Levin's economic losses, personal injury, pain and suffering, extreme emotional distress, and loss of society; and in the amount of $15,000,000 for Plaintiff Lucille Levin's economic losses, personal injury, pain and suffering, extreme emotional distress, and loss of society.

Pursuant to the FSIA, in order to be granted a default judgment, Plaintiffs must establish their right to relief by "evidence satisfactory to the court." 28 U.S.C. § 1608(e). The district courts for the District of Columbia have permitted plaintiffs in other FSIA and terrorist cases to establish their right to relief through affidavits and documentary evidence alone. *See, e.g., Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 21 (2001); *Haim v. Islamic Republic of Iran*, 425 F. Supp 2d 56, 59-60 (D.D.C. 2006); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 n.1 (D.D.C. 2003); *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 111 (6th Cir. 1995) ("Use of affidavits in granting default judgments does not violate either due process or the FSIA.").

Plaintiffs therefore ask the Court to enter a default judgment based on Plaintiffs' affidavits and documentary evidence filed in support of their Motion.  If for any reason the Court does not grant Plaintiffs' Motion for Default Judgment, Plaintiffs request that the court give Plaintiffs further direction and an opportunity to supplement their Motion with further affidavits, documentary evidence, and/or live testimony as the Court may direct.

## III.    JURISDICTION AND VENUE

### A.    SUBJECT MATTER JURISDICTION

This action is brought against a foreign state and its intelligence services acting as its agents, under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 *et seq.*, as amended ("FSIA").  This Court has jurisdiction over this matter under the FSIA. *See Flatow v. Islamic Repulibic of Iran*, 999 F. Supp. 1, 10-11 (D.D.C. 1998), reversed on other grounds as recognized in *Haim*, 425 F. Supp. 2d 56 (D.D.C. 2006); *see also Verlinden B.V. v. Central Bank of Nigeria*, 41 U.S. 480 (1983); 28 U.S.C. § 1330.

In the Anti-Terrorism and Effective Death Penalty Act of 1996, Congress lifted the immunity of foreign states officially designated by the Department of State as terrorist states, if the foreign state commits a terrorist act or provides material support and resources to an individual or entity which commits such an act which results in the death or personal injury of a United States citizen. *See Flatow*, 999 F. Supp. at 12; *see also* 28 U.S.C. § 1605(a)(7); H.R. Rep. No. 383, 104th Cong., 1st Session 1995 at 137-38, *available at* 1995 WL 731698.

Congress has expressly directed the retroactive application of 28 U.S.C. §
1605(a)(7):

> The amendments made by this subtitle shall apply to any cause of
> action arising before, on, or after the date of the enactment of this
> Act [Apr. 24, 1996].

Pub. L. No. 104-132, § 221(c); *see also Flatow*, 999 F. Supp. at 13.

In order to establish subject matter jurisdiction pursuant to 28 U.S.C. §
1605(a), a claim must contain the following statutory elements:

> (1) that personal injury or death resulted from an act of torture,
> extrajudicial killing, aircraft sabotage, or hostage taking; and
>
> (2) the act was either perpetrated by the foreign state directly or by a
> non-state actor which receives material support or resources from the
> foreign state defendant; and
>
> (3) the act or the provision of material support or resources is
> engaged in by an agent, official or employee of the foreign state
> while acting within the scope of his or her office, agency or
> employment; and
>
> (4) that the foreign state be designated as a state sponsor of terrorism
> either at the time the incident complained of occurred or was later so
> designated as a result of such act; and
>
> (5) if the incident complained of occurred with [sic] the foreign state
> defendant's territory, plaintiff has offered the defendants a
> reasonable opportunity to arbitrate the matter; and
>
> (6) either the plaintiff or the victim was a United States national at
> the time of the incident; and
>
> (7) similar conduct by United States agents, officials, or employees
> within the United States would be actionable.

*Flatow*, 999 F. Supp. at 16; *see also* 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. §
1605 note.  These statutory elements have been held to be satisfied in other cases

where Hizbollah, sponsored by Iran and MOIS, held Americans like Mr. Levin

hostage in Lebanon. *See, e.g., Cicippio v. Iran*, 18 F. Supp. 2d 62, 68 (D.D.C.

1998); *Jenco*, 154 F. Supp. 2d at 33 n.7.

        **1.**     **Mr. Levin Was A Victim Of Torture And Hostage Taking**

     Mr. Levin was a victim of "torture" and "hostage taking" within the

meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605(e)(1) and (2). *See*

*Cicippio*, 18 F. Supp. 2d at 68.

     "Torture," under 28 U.S.C. § 1605(e)(1) is defined as:

> (1) [T]he term "torture" means any act, directed against an individual
> in the offender's custody or physical control, by which severe pain or
> suffering (other than pain or suffering arising only from or inherent
> in, or incidental to, lawful sanctions), whether physical or mental, is
> intentionally inflicted on that individual for such purposes as
> obtaining from that individual or a third person information or a
> confession, punishing that individual for an act that individual or a
> third person has committed or is suspected of having committed,
> intimidating or coercing that individual or a third person, or for any
> reason based on discrimination of any kind; and

> (2) mental pain or suffering refers to prolonged mental harm caused
> by or resulting from--

> (A) the intentional infliction or threatened infliction of severe
> physical pain or suffering;

> (B) the administration or application, or threatened administration or
> application, of mind altering substances or other procedures
> calculated to disrupt profoundly the senses or the personality;

> (C) the threat of imminent death; or

> (D) the threat that another individual will imminently be subjected to
> death, severe physical pain or suffering, or the administration or
> application of mind altering substances or other procedures
> calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1605(e)(1), citing to section 3 of the Torture Victim Protection Act of

1991, P.L. 102-256, 106 Stat 73 (March 12, 1992).

"Hostage taking" is defined as:

> Any person who seizes or detains and threatens to kill, to injure or to
> continue to detain another person (hereinafter referred to as the
> "hostage") in order to compel a third party, namely, a State, an
> intentional intergovernmental organization, a natural or juridical
> persona, or a group of persons, to do or abstain from doing any act
> as an explicit or implicit condition for the release of the hostage
> commits the offense of taking of hostages within the meaning of this
> Convention.

28 U.S.C. §1605(e)(2), citing to Article 1 of the International Convention Against

the Taking of Hostages.

Mr. Levin was taken hostage by Hizbollah on March 7, 1984 and held for

343 days until his escape of February 14, 1985. Jerry Levin Affidavit ¶¶ 6, 39 (Ex.

B to Smith Decl.). He was used by Hizbollah to bargain for the release of 17

Shiite prisoners being held by the Kuwaiti government for the bombing of the

French and U.S. Embassies in Kuwait. *Id.* ¶¶ 31-32.

Mr. Levin was also tortured physically and mentally during his captivity.

"[T]he deprivation of adequate food, light, toilet facilities, and medical care . . .

amounts to torture within the meaning of section 1605(a)(7)." *Sutherland*, 151 F.

Supp. 2d at 45; *Jenco*, 154 F. Supp. 2d at 32. Mr. Levin was held for 343 days in

various unheated cells, without adequate food, toilet facilities, or medical care.

Jerry Levin Affidavit ¶¶ 14-27 (Ex. B to Smith Decl.). He was also physically

beaten and psychologically abused. *Id.* ¶¶ 9-11, 18-20, 40.

### 2. The Act Was Perpetrated By A Group That Received Material Support And Resources From Defendants

28 U.S.C. § 1605(a)(7) adopts the definition of "material support or

resources" set forth in the federal criminal code, 18 U.S.C. § 2339A:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

This Court in *Flatow* held that the routine provision of financial assistance

to a terrorist group in support of its terrorist activities constitutes "providing

material support or resources" for a terrorist act within the meaning of 28 U.S.C. §

1605(a)(7). *Flatow*, 999 F. Supp at 18. Further, the *Flatow* court found that "a

plaintiff need not establish that the material support or resources provided by a

foreign state for a terrorist act contributed directly to the act from which his claim

arises in order to satisfy 28 U.S.C. § 1605(a)(7)'s statutory requirements for

subject matter jurisdiction. Sponsorship of a terrorist group which causes the

personal injury or death of a United States national alone is sufficient to invoke

jurisdiction." *Id.*

Mr. Levin's captors were Hizbollah. *See* Clawson Affidavit ¶ 15(b) (Ex. D

to Smith Decl.); *see also* Jerry Levin Affidvait ¶¶ 30-31 (Ex. B to Smith Decl.); Dr.

Levin Affidavit ¶ 6 (Ex. C to Smith Decl); Bolling Affidvait ¶ 16 (Ex. E to Smith

Decl.); U.S. Dep't of State, *Patterns of Global Terrorism 1985*, at 18 (Ex. H to

Smith Decl.) ("Hizballah factions kidnapped nearly a dozen Westerners in

Lebanon in 1985, although two Americans - Jeremy [Jerry] Levin and the

Reverend Benjamin Weir, both seized in 1984 - escaped or were released.").  It

has been well established within the intelligence, academic, and legal communities

that Iran, the MOIS, and the IRGC were providing material support and resources

to Hizbollah in the early 1980's. *See, e.g., Cicippio*, 18 F. Supp. 2d at 68 ("Iran . . .

openly provided 'material support or resources' to Hizballah . . . ."); *see also*

*Jenco*, 154 F. Supp. 2d 33 n.7 ("Iran and the Iranian MOIS provided 'material

support or resources' to Hizbollah . . ."); *Salazar v. Islamic Republic of Iran*, 370

F. Supp. 2d 105, 111 (D.D.C. 2005) ("With the support of the MOIS and the

IRGC, Hizbollah undertook a series of terrorist acts directed at Westerners in the

early 1980s."); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 51

(D.D.C. 2003) ("Hezbollah is . . . the name of a group of Shi'ite Muslims in

Lebanon that was formed under the auspices of the government of Iran."); *Stern v.*

*Islamic Republic of Iran*, 271 F. Supp. 2d 286, 293 n.5 (D.D.C. 2003) ("[I]t is now

the universally held view of the intelligence community that Iran was responsible

for the formation, funding, training, and management of Hizbollah.") (quoting

*Higgins v. Iran*, 2000 WL 33674311 (D.D.C.2000)).

   In addition, it is the expert opinion of Dr. Patrick Clawson, who is the

Deputy Director for Research of the Washington Institute for Near East Policy,

and who has been qualified to testify as an expert on Iranian sponsorship of

terrorism in over a dozen hostage cases, that:

> (a) Iran's Ministry of Information and Security (MOIS) and
> Islamic Revolutionary Guard Corp (IRGC) have been major
> institutions through which the Iranian government has
> provided financial, technical, and material support for
> terrorism, including the holding of hostages in Lebanon,
> among them Jeremy ("Jerry") Levin;
>
> (b) The radical Shiite group Hizbollah took Jeremy Levin
> hostage in 1984; and
>
> (c) Hizbollah was trained, supported, aided, abetted and
> funded by the Iranian government through MOIS and IRGC,
> and otherwise would not have had the expertise and skills
> needed to hold Jerry Levin captive while eluding the
> extensive search efforts of the U.S. and others.

Clawson Affidavit ¶ 15 (Ex. D to Smith Decl.).

The evidence clearly establishes that Mr. Levin's kidnapping was

perpetrated by Hizbollah, and that Hizbollah was receiving material support and

resources from Iran, the MOIS, and the IRGC.

### 3. The Provision Of Material Support Was Engaged In By Iranian Officials, Employees, Or Agents Acting Within The Scope Of Their Office, Employment Or Agency

"The law of *respondeat superior* demonstrates that if a foreign state's agent,

official or employee provides material support and resources to a terrorist

organization, such provision will be considered an act within the scope of his or

her agency, office or employment." *Flatow*, 999 F. Supp. at 18. "[I]f a foreign

state's heads of state, intelligence service, and minister of intelligence routinely

provide material support or resources to a terrorist group, whose activities are

consistent with the foreign state's customs or policies, then that agent and those officials have acted squarely within the scope of their agency and offices within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A § 1605 note." *Id.*

The courts have consistently found in other hostage cases that agents and officials of the Iranian government, the MOIS, and the IRGC were acting within the scope of their agency and offices in providing material support and resources to Hizbollah. *See, e.g., id.*; *Cicippio*, 18 F. Supp. 2d at 68.

With respect to Mr. Levin specifically, as stated by Dr. Clawson in his affidavit:

> Based on my personal knowledge and research of the type reasonably relied on by an expert in my field, it is my expert opinion that Jerry Levin's capture and incarceration was part of a systematic plan orchestrated by agencies of the Iranian government, in particular MOIS and IRGC. The MOIS and IRGC funded, supported and trained Hizbollah, directed their hostage-taking activities, and provided "cover" for Hizbollah so that the hostages would not be discovered. The highest levels of the Iranian government were involved in the decisions to pursue this course of action. Mr. Levin was the first in a long line of hostages taken by Hizbollah at the direction and instigation of the Iranian government, the MOIS, and the IRGC.

Clawson Affidavit ¶ 20 (Ex. D to Smith Decl.) (emphasis added).

### 4.    Iran Has Been Designated A State Sponsor Of Terrorism

Iran has been designated a state sponsor of terrorism by the Department of State since January 1984. *See* 49 Fed. Reg. 2836-02 ("In accordance with Section 6(i) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(i), I [Sec. of

State George P. Schultz] hereby determine that Iran is a country which has repeatedly provided support for acts of international terrorism."). In addition, it has been held that the MOIS and IRGC "must be treated as the state of Iran itself rather than as its agent." *Salazar*, 370 F. Supp. 2d at 116.

### 5. The Kidnapping Did Not Occur In Iran

Mr. Levin was kidnapped in Beirut, Lebanon, and not within the territory of Iran. Jerry Levin Affidavit ¶ 6 (Ex. B to Smith Decl.). Therefore, under 28 U.S.C. § 1605(a)(7), Plaintiffs did not need to offer Defendants an opportunity to arbitrate.

### 6. Plaintiffs Were U.S. Nationals At The Time The Acts Occurred

Plaintiffs were both residents of Washington D.C. before moving to Lebanon, and both were U.S. nationals at the time the acts occurred. Jerry Levin Affidavit ¶ 4 (Ex. B to Smith Decl.); Dr. Levin Affidavit ¶ 2 (Ex. C to Smith Decl.).

### 7. Similar Acts Would Be Actionable If Conducted By Officials, Employees, Or Agents Of The United States

If officials of the United States, while acting in their official capacities, provided material support and resources to a terrorist group which was responsible for hostage taking and torture within the United States, those officials would not be immune from civil suits for wrongful death and personal injury. *See, e.g.*, U.S. Const. Amend. 5; 42 U.S.C. § 1983; 18 U.S.C. §§ 1203, 3339(a), 2340(a).

As recognized by the Court in *Cicippio*, *Flatow*, and dozens of other hostage cases, subject matter jurisdiction is established under 28 U.S.C. §

1605(a)(7), and Defendants Iran, the MOIS, and the IRGC, as sponsors of

Hizbollah, are responsible for the personal injuries inflicted upon by Hizbollah on

hostages and their families, such as Mr. and Dr. Levin. *See e.g.*, *Flatow*, 999 F.

Supp. at 18; *Cicippio*, 18 F. Supp. 2d at 68; *Sutherland*, 151 F. Supp. 2d at 47.

### B.    PERSONAL JURISDICTION

"The FSIA provides that personal jurisdiction over defendants will exist

where Plaintiff establishes the applicability of an exception to immunity pursuant

to 28 U.S.C. § 1604, § 1605, or § 1607 and service of process has been

accomplished pursuant to 28 U.S.C. § 1608." *Flatow*, 999 F. Supp. at 19. As set

forth above, Defendants fall within an exception to immunity pursuant to 28 U.S.C.

§ 1607(a)(7), because Defendants provided material support and resources to

Hizbollah, which committed acts that resulted in the personal injury of Plaintiffs.

In addition, as set forth in section II *supra*, service was effected on each of the

Defendants pursuant to 28 U.S.C. § 1608. Finally, the court in *Flatow* held that

the exercise of personal jurisdiction over foreign state sponsors of terrorism which

cause the personal injury or death of United States nationals is proper under the

Constitution. *Id.* at 19-23.

### C.    VENUE

Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which

states:

> A civil action against a foreign state as defined in section 1603(a) of
> this title may be brought . . . in the United States District Court for

the District of Columbia if the action is brought against a foreign
state or political subdivision thereof.

28 U.S.C. § 1391(f)(4).

## IV.     LIABILITY

The federal district courts in similar cases have already held that Iran is

liable to victims of state sponsored terrorism, particularly terrorist acts committed

in Lebanon by Hizbollah. *See, generally*, Flatow, 999 F. Supp. 1; *Cicippio*, 18 F.

Supp. 2d 62, *Sutherland*, 151 F. Supp. 2d 27, *Jenco*, 154 F. Supp. 2d 27; *Peterson*,

264 F. Supp. 2d 46. "Should an exception to the FSIA apply and a foreign state

have no sovereign immunity as to a given claim, 'the foreign state shall be liable

in the same manner and to the same extent as a private individual under like

circumstances; but a foreign state except for an agency or instrumentality thereof

shall not be liable for punitive damages.'" *Salazar*, 370 F. Supp. 2d at 112; *see*

*also* 28 U.S.C. § 1606.

The law of Plaintiffs' state of domicile at the time of the incident, or

Plaintiffs' last state of domicile if they were living overseas at the time of the

incident, governs the rule of decision for issues of liability. *See Salazar*, 370 F.

Supp. 2d at 14; *see also Dammarell v. Islamic Republic of Iran*, 2005 WL 756090,

at *22 (D.D.C. 2005). Here, Plaintiffs were both residents of Washington D.C.

prior to moving to Beirut. Jerry Levin Affidavit ¶ 4 (Ex. B to Smith Decl.); Dr.

Levin Affidavit ¶ 2 (Ex. C to Smith Decl.).

/ / /

Plaintiffs have established their right to relief under the common law of the District of Columbia.

## A.    FALSE IMPRISONMENT

"'[T]he unlawful detention of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion . . . by actual force, or by fear of force, or even by words' constitutes false imprisonment." *Dent v. May Dept. Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982).

Hizbollah intentionally and unlawfully used force and threat of force to restrain, detain, and confine Jerry Levin for 343 days, from March 7, 1984 to February 14, 1985. Jerry Levin Affidavit ¶¶ 6, 43 (Ex. B to Smith Decl.). As described in detail in Mr. Levin's affidavit, attached as Exhibit B to the Declaration of Suzelle M. Smith, and in section I, *supra*, Mr. Levin was forced into a car in Beirut at gunpoint by members of Hizbollah. *Id.* ¶ 6. The terrorists held him at an unknown location in Beirut before transporting him to the Bekka Valley, where he was held in a succession of small cells and chained to the floor. *Id.* ¶¶ 9-14. Mr. Levin was let out of his cell once a day to use the restroom at which times he was always escorted by an armed guard. *Id.* ¶ 19. As a direct and proximate result of Hizbollah's unlawful restraint and confinement of Jerry Levin, Mr. Levin sustained serious physical and psychological injuries for which he continues to require medical treatment, and has lost his career as a professional news correspondent. *Id.* ¶¶ 49-52.

These acts are attributable to Defendants because Defendants substantially funded and controlled Hizbollah. *See supra* § III(A)(2). As such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Jenco*, 154 F. Supp. at 34-35; *see also Sutherland*, 151 F. Supp. 2d at 49; *Flatow*, 999 F. Supp. at 26-27.

### B.    BATTERY

"To establish liability for the tort of battery in the District of Columbia, a plaintiff must plead and prove 'an intentional, unpermitted, harmful or offensive contact with his person or something attached to it.'" *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 275 (D.D.C. 2005) (quoting *Marshall v. Dist. of Columbia*, 391 A.2d 1374, 1380 (D.C.1978)).

Mr. Levin suffered harmful contact at the hands of Hizbollah. As described in detail in Mr. Levin's affidavit, he was pulled off of a Beirut street at gunpoint, shoved into a car, bound and gagged, and wrapped from head to toe in packing tape. Jerry Levin Affidavit ¶¶6-13 (Ex. B to Smith Decl.). His captors beat him throughout his captivity, including jumping up and down on his legs, *id.* ¶¶ 9, 18, 40; and kept him chained him to a wall, *id.* ¶¶ 14-15. His captors would shove unloaded pistols against Mr. Levin's neck or underneath his blindfold so he could see the barrel, and pull the trigger. *Id.* ¶ 20. As a direct and proximate result of Hizbollah's battery of Jerry Levin, Mr. Levin sustained serious physical and psychological injuries for which he continues to require medical treatment, and has lost his career as a professional news correspondent. *Id.* ¶¶ 49-52.

These acts, which were intentionally committed by Mr. Levin's captors, are attributable to Defendants because Defendants substantially funded and controlled Hizbollah. *See supra* § III(A)(2). As such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Jenco*, 154 F. Supp. at 34; *see also Sutherland*, 151 F. Supp. 2d at 48; *Flatow*, 999 F. Supp. at 26-27.

## C.    ASSAULT

"[A]n assault may be defined as an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Etheredge v. Dist. of Columbia*, 635 A.2d 908, 916 (D.C. 1993).

As described in detail in Mr. Levin's affidavit, Mr. Levin's captors constantly threatened beat and kill him if he did not obey their commands. Jerry Levin Affidavit ¶¶ 18-20, 40 (Ex. B to Smith Decl.). As the court recognized in *Sutherland*, hostages like Mr. Levin "lived . . . in an environment where, at any moment, he might find himself harassed or beaten for virtually no reason at all" and "[i]n this sense, it is not a gross exaggeration to suggest that [he] withstood a continuous . . . assault." *Sutherland*, 151 F. Supp. 2d at 48. At all times during his captivity, Mr. Levin believed that his captors would carry out their threats to hit or even kill him, and he lived in constant fear of immediate bodily harm at the hands of his captors. Jerry Levin Affidavit ¶¶ 18, 34-35 (Ex. B to Smith Decl.). As a direct and proximate result of Hizbollah's assault of Jerry Levin, Mr. Levin sustained serious physical and psychological injuries for which he continues to

require medical treatment, and has lost his career as a professional news correspondent. *Id.* ¶¶49-52.

These acts, which were intentionally committed by Mr. Levin's captors, are attributable to Defendants because Defendants substantially funded and controlled Hizbollah. *See supra* § III(A)(2). As such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Jenco*, 154 F. Supp. at 34; *see also Sutherland*, 151 F. Supp. 2d at 49; *Flatow*, 999 F. Supp. at 26-27.

### D.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

"The tort of IIED requires a showing of '(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Dammarel*, 404 F. Supp. 2d at (quoting *Howard University v. Best*, 484 A.2d 958, 985 (D.C.1984)).

The district courts have held that "[t]errorist acts, by their nature, are intentionally designed to inflict harm, and thereby to cause severe emotional distress." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 104 (2006). Moreover, "the act of engaging in terrorism by means of material support and civil conspiracy is extreme, outrageous, and goes beyond all possible bounds of decency. Terrorists seek to cause extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately outrageous." *Id.*

Hizbollah intentionally kidnapped Mr. Levin and held him hostage for 343 days. This conduct "quite easily qualifies as extreme and outrageous." *Jenco*, 154

F. Supp. 2d at 35. As a direct and proximate result of such conduct, Mr. Levin suffered extreme emotional distress both during his captivity and after his escape, and has sought and continues to seek professional psychological treatment to help him cope with the mental distress and trauma of his captivity. Jerry Levin Affidavit ¶ 51 (Ex. B to Smith Decl.). Such emotional distress has also resulted in the loss of Mr. Levin's career as a professional news correspondent. *Id.* ¶ 52.

With respect to Dr. Levin, "[c]ourts have uniformly held that a terrorist attack - by its nature - is directed not only at the victims but also at the victims' families." *Salazar*, 370 F. Supp. 2d at 115 n.12. "When an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostages' immediate family. Further . . . an organization taking someone hostage implicitly believes that such emotional distress is substantially certain to result." *Sutherland*, 151 F. Supp. 2d at 50.

In some sense, the families of terrorist captives, particularly the spouses, suffer at least as much if not more than the hostages themselves. The spouse does not know if the partner is alive or dead. She cannot mourn, for she hopes he lives. Yet hope is truly irrational, and the safe return of a terrorist captive is unlikely. The spouse cannot rebuild a separate live and is caught in an almost unique state of agonizing limbo. Dr. Levin spent the entire 343 days of her husband's captivity fearing for his life and vacillating wildly between hope and despair. Dr. Levin Affidavit ¶ 4 (Ex. C to Smith Decl.); Bolling Affidavit ¶ 6 (Ex. E to Smith Decl.). She was consumed by the terrifying thought that she might never see her husband

again, yet not knowing whether he was alive or dead, she worked tirelessly and spent all of their savings attempting to find her husband and secure his release. Dr. Levin Affidavit ¶ 5 (Ex. C to Smith Decl.); Bolling Affidavit ¶ 11-12 (Ex. E to Smith Decl.). In a further act of terrorism, Defendants tape recorded Mr. Levin in an extremely vulnerable and debilitated state and forced him to read a prepared statement that he would be killed if convicted terrorists in Kuwait were not released. Jerry Levin Affidavit ¶ 32 (Ex. B to Smith Decl.). Hizbollah released the videotape, which was viewed by Dr. Levin. Dr. Levin Affidavit ¶ 8 (Ex. C to Smith Decl.). Mrs. Levin watched the videotape of her husband, and her fear intensified when she observed his emaciated state and disheveled appearance. *Id.* Dr. Levin was so consumed by fear that she needed and still needs professional psychological treatment to help her deal with the mental distress and trauma of living through her husband's captivity. *Id.* ¶¶ 17-19.

Hizbollah's actions were deliberate and outrageous, and intended to cause severe emotional distress to Mr. Levin and his wife, and it did in fact cause such severe emotional distress. *See Greenbaum*, 451 F. Supp. 2d at 104; *see also Sutherland*, 151 F. Supp. 2d at 50. These acts, which were intentionally committed by Mr. Levin's captors, are attributable to Defendants because Defendants substantially funded and controlled Hizbollah. *See supra* § III(A)(2). As such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Jenco*, 154 F. Supp. at 35; *see also Sutherland*, 151 F. Supp. 2d at 49-50; *Flatow*, 999 F. Supp. at 26-27.

### E.    NEGLIGENCE

"The plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Etheredge*, 635 A.2d at 917. "A uniform standard of care applies in actions for negligence: reasonable care under the circumstances." *Battle v. Thornton*, 646 A.2d 315, 319 (D.C. 1994).

Hizbollah breached its duty of reasonable care to Mr. Levin by depriving Mr. Levin of adequate food, light, toilet facilities, and medical care. Jerry Levin Affidavit ¶¶ 21-27 (Ex. B to Smith Decl.). As a direct and proximate result of the deplorable conditions in which Hizbollah held Mr. Levin, Mr. Levin developed severe and life-threatening illnesses and infections, including a severe ear infection that has left him almost deaf in both ears and hepatitis, for which he still requires regular medical attention. *Id.* ¶¶ 26-27.

These acts, which were committed by Mr. Levin's captors, are attributable to Defendants because Defendants substantially funded and controlled Hizbollah. *See supra* § III(A)(2). As such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow*, 999 F. Supp. at 26-27.

### F.    LOSS OF CONSORTIUM

In the District of Columbia, a spouse may recover for loss of consortium "where the plaintiff proves an actual loss of services or affection as a result of an

actionable tort against his or her spouse even though the latter has suffered no physical injury." *Crowley v. North American Telecomm. Ass'n*, 691 A.2d 1169, 1175 (D.C. 1997). Plaintiffs in other hostage cases have been awarded damages for loss of consortium. *See, e.g., Cicippio*, 18 F. Supp. 2d at 70; *Sutherland*, 151 F. Supp. 2d at 51.

Hizbollah intentionally inflicted extreme emotional distress on Mrs. Levin by kidnapping and holding her husband hostage for 11 months. Mrs. Levin's extreme emotional distress has deprived Mr. Levin of his wife's services, affection, society, and companionship, and exacted a toll on Plaintiffs' marital relationship. As a result, Plaintiffs' have required continual counseling to deal with the stress placed on their relationship. Dr. Levin Affidavit ¶¶ 13-18 (Ex. C to Smith Decl.); Jerry Levin Affidavit ¶ 51 (Ex. C to Smith Decl.).

Mr. Levin's Hizbollah captors caused Dr. Levin to be deprived of Mr. Levin's services, affection, society, and companionship for the 343 days in which her husband was held captive. Dr. Levin Affidavit ¶¶ 3-4 (Ex. C to Smith Decl.). Even following Mr. Levin's release, the stress and trauma of his captivity has continued to exact a toll on their marital relationship, and Plaintiffs' have required continual counseling to deal with the stress placed on their relationship. *Id.* ¶¶ 13-18; Jerry Levin Affidavit ¶ 51 (Ex. B to Smith Decl.).

These acts, which were committed by Mr. Levin's captors, are attributable to Defendants because Defendants substantially funded and controlled Hizbollah. *See supra* § III(A)(2). As such, Defendants are liable under the tort doctrines of

*respondeat superior* and joint and several liability. *See Flatow*, 999 F. Supp. at 26-27.

## V.    DAMAGES

"The Foreign Sovereign Immunities Act specifically permits plaintiffs suing under section 1605(a)(7) to pursue 'money damages which may include economic damages, solatium, pain, and suffering.'" *Sutherland*, 151 F. Supp. 2d at 50-51; *see also* 28 U.S.C. § 1605 note. Punitive damages are not available against Defendants Iran, the MOIS, or the IRGC. *See Salazar*, 370 F. Supp. 2d at 116 (declining plaintiff's prayer for punitive damages against Iran, the MOIS, and the IRGC); *see also* 28 U.S.C. 1606 ("[A] foreign state . . . shall not be liable for punitive damages.").

Mr. Levin suffered extreme physical and psychological harm during his captivity, including but not limited to contracting hepatitis and a severe ear infection that has left him nearly deaf in both ears. Jerry Levin Affidavit ¶¶ 26-27 (Ex. B to Smith Decl.). Since his release, he has continued to suffer the effects of his kidnapping. He has a constant ringing in both his ears that his doctors have said will never go away. *Id.* ¶ 27. In addition, Mr. Levin has had to have three complete eardrum replacement surgeries and three separate procedures to have drainage tubes placed in his ears. *Id.* ¶ 49. He requires the regular care of an ear doctor, suffers recurring ear infections, and has to wear hearing aids in both his ears. *Id.* ¶ 49. Mr. Levin has also undergone psychological and marriage counseling to help him cope with the stress of his kidnapping and torture. *Id.* ¶ 51.

Mr. Levin's career as a professional news correspondent and a CNN Bureau Chief was permanently destroyed. *Id.* ¶ 52. As with many hostage victims, Mr. Levin found upon his return that he was unable to continue at his prior job or succeed at a new one. *Id.*; *see also Cicippio*, 18 F. Supp. 2d at 69. Mr. Levin seeks compensatory damages for his personal injuries, emotional distress, economic loss, and loss of consortium in the amount of Twenty-Five Million Dollars ($25,000,000).

Dr. Levin suffered extreme emotional distress as a result of her husband's captivity. She was forced to endure and cope with the terror, anxiety, shock and stress. Dr. Levin Affidavit ¶ 13 (Ex. C to Smith Decl.). Watching news reports about Mr. Levin's kidnapping, witnessing the videotaped images of his obvious physical and emotional trauma, and living through the continuous threats on his life exacted an extreme psychological toll on Dr. Levin. *Id.* ¶ 14. She has been diagnosed with Reacting Clinical Depression and has been in therapy since 1984. *Id.* She must also take medications daily, including Wellbutrin, Lamictal, and Pexeva. *Id.* ¶ 15. Dr. Levin's doctors have told her that she will continue to need therapy and medications for the rest of her life. *Id.* ¶ 18. Dr. Levin seeks compensatory damages for her emotional distress and loss of consortium in the amount of Fifteen Million Dollars ($15,000,000).

## VI.  CONCLUSION

This Court possesses subject matter jurisdiction over this action and personal jurisdiction over Defendants. Plaintiffs have established by clear and

convincing evidence, as set forth in the affidavits and documents submitted in support of Plaintiffs' Motion, that Defendants Iran, the MOIS, and the IRGC are jointly and severally liable to Plaintiffs for all damages suffered as a direct result of Hizbollah's hostage taking and torture of Plaintiff Jerry Levin.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court enter judgment by default in the amount of Twenty-Five Million Dollars ($25,000,000) for Plaintiff Jerry Levin and Fifteen Million Dollars ($15,000,000) for Plaintiff Dr. Lucille Levin, for Plaintiffs' economic losses, personal injury, pain and suffering, extreme emotional distress, and loss of society. If for any reason the Court does not grant Plaintiffs' Motion for Default Judgment, Plaintiffs request that the Court give Plaintiffs further direction and an opportunity to supplement their Motion with further affidavits, documentary evidence, and/or live testimony as the Court may direct.

Dated: December 12, 2006          Respectfully submitted,

/s/ Suzelle M. Smith
Suzelle M. Smith
D.C. Bar No. 376384
Howarth & Smith
523 West Sixth Street, Suite 728
Los Angeles, California 90014
Phone:  213-955-9400
Fax: 213-622-0791

Attorney for Plaintiffs