## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JEREMY LEVIN and DR. LUCILLE LEVIN, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. No. 05-2494 (GK/JMF) |
| | : | |
| ISLAMIC REPUBLIC OF IRAN; IRANIAN | : | |
| MINISTRY OF INFORMATION AND | : | |
| SECURITY; SEYYED ALI HOSSEINI | : | |
| KHAMENEI; MOHAMMAD | : | |
| MOHAMMADI NIK; and IRANIAN ISLAMIC | : | |
| REVOLUTIONARY GUARD CORP, | : | |
| | : | |
| Defendants. | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action came before the Court for an evidentiary hearing on August 14, 2007.

Plaintiffs are Jeremy Levin ("Jerry Levin" or "Mr. Levin") and Dr. Lucille Levin ("Dr.

Levin"). Defendants are the Islamic Republic of Iran ("Iran"), the Iranian Ministry of

Information and Security ("MOIS"), and the Iranian Revolutionary Guard Corp.

("IRGC").

Based upon the testimony of the witnesses presented during the hearing, and the

sworn affidavits and documents entered into evidence in accordance with the Federal

Rules of Evidence, the Court makes the following findings of fact and conclusions of

law.

### FINDINGS OF FACT

#### Plaintiffs

### A.   Mr. Levin

1.      In December 1983, Mr. Levin was employed by CCN as Bureau Chief and correspondent in its Beirut office in Lebanon. Jerry Levin Affidavit ¶ 5.

2.      On January 22, 1984, his wife, Dr. Levin, joined him in Beirut. Dr. Levin Affidavit ¶ 1.

3.      On March 7, 1984, Ash Wednesday, Mr. Levin was kidnapped on the street in Beirut while walking from his apartment to work. Transcript of Evidentiary Hearing, dated Aug. 14, 2007 ("Trial Tr."), at 11:12-14; Jerry Levin Affidavit ¶ 6.  A gun was shoved at his waist, and he was forced into a car and threatened with death should he open his eyes. Trial Tr. at 11:21-13:22.  He was blindfolded, beaten, and interrogated at a local apartment. Jerry Levin Affidavit ¶¶ 6-7.  He was accused of being a CIA spy and an Israeli spy. Trial Tr. at 17:25-20:22.  When he denied these accusations, he was accused of being a liar, and threatened with death if he was lying.  After hours of this treatment, he was gagged and wrapped from head to foot in packing tape, placed in the false bottom of a truck, and driven out of Beirut and into the Bekaa Valley, several hours away. *Id.* at 21:4-22:6; Jerry Levin Affidavit ¶¶ 8-12.

4.      While in the Bekaa Valley, Mr. Levin was held in a tiny, unheated room and chained to the wall. Jerry Levin Affidavit ¶¶ 13-17.  Mr. Levin was severely restricted by the length of the chain, which was short and attached low to the wall, preventing Mr. Levin from being able to stand up. *Id.* ¶ 14.  He was also unable to turn when he lay down, and was reduced to lying on one side of his body for the entire time of his captivity. *Id.* ¶ 16; Trial Tr. at 33:24-34:9.  While in captivity, Mr. Levin was held in several different houses.  Each time, he was held in a small, unheated room, and always kept either chained to the wall or, on one occasion, a radiator. Jerry Levin Affidavit ¶ 14.

He was also kept in solitary confinement. Trial Tr. at 31:1-3. For a number of weeks, he was in total darkness and didn't remove his blindfold for fear of being shot. Part of the "training" by his captors was to put a gun to his head and say "you no see." Trial Tr. at 38:21-39:17. After a while, he dared to take his blindfold off some of the time, but only when his captors were out of the room. During those times, he tried to devise some means of escape. *Id*. at 63:9-23. During the 343 days of his captivity, Mr. Levin never saw another human face. He was told that if he did see any faces, he would be killed. Trial Tr. at 40:1-6.

5.      Over the course of the eleven and a half months that he was held hostage, Mr. Levin's captors beat him, mocked him continuously, and threatened him with imminent death. Jerry Levin Affidavit ¶¶ 18-20. His captors jumped on his legs, slapped and punched him, and told him they were going to kill him. *Id*. ¶¶ 18-20; Trial Tr. at 40:7-16. His captors would emphasize their threats by shoving the barrel of a gun under Mr. Levin's blindfold where he could see it and pulling the trigger so that Mr. Levin could hear the hammer click on an empty chamber. Jerry Levin Affidavit ¶ 20; Trial Tr. at 38:21-39:25.

6.      On one occasion, approximately four weeks into his captivity, Mr. Levin was told by his captors that he would be released. He was wrapped again from head to foot in packing tape but this time his captors wrapped the tape so tightly that it cut off the circulation in Mr. Levin's arms and legs. Trial Tr. at 36:25-38:20. Mr. Levin testified this was on of the most frightening and painful moments of his life. *Id*. He was again forced into the false bottom of the truck for the over two hour ride back to Beirut. About an hour into the drive, Mr. Levin was in so much pain that he began yelling for help. The

truck pulled over and his captor told him to shut up or he would be killed. *Id*. When they finally arrived in Beirut and Mr. Levin was unwrapped, but he was unable to stand. He could not feel his arms or legs. *Id*. It took about four months for Mr. Levin to regain full feeling and function in his limbs. *Id*. Mr. Levin spent several days in Beirut, anxiously awaiting his release but his hopes of freedom were dashed when he was told he would not be released. He was then again wrapped from head to toe with packing tape, blindfolded, and gagged. Trial Tr. at 55:21-58:17. In this condition, without water or any chance to relieve himself, he was taken back to the Bekka Valley. Mr. Levin experienced the mental anguish of being told that he would be released and then abruptly returned to captivity. *Id*. No explanation was given to him for this treatment but he believes this may have been more of his training as a prisoner to break his spirit and will. *Id*.

7.      Mr. Levin's captors deprived him of food and the most basic hygienic care. *Id*. at 43:17-44:7, 45:4-13; Jerry Levin Affidavit ¶¶ 21-22. He was only allowed to use the toilet once a day, and was watched and mocked by his captors while he urinated. Jerry Levin Affidavit ¶ 19. In his first three months of captivity, Mr. Levin was only allowed one shower and only one change of clothes. *Id*. ¶ 22. Mr. Levin's room was not heated and he nearly froze during the cold winter nights. *Id*. ¶ 17.

8.      Mr. Levin developed several life-threatening illnesses as a direct result of his poor living conditions, hygiene, and diet, including hepatitis and a severe ear infection that harmed his hearing in both ears. *Id*. ¶¶ 23-27, 49-51; Trial Tr. at 42:24-43:16, 45:14-20. When he contracted hepatitis, Mr. Levin became critically ill, suffering from severe abdominal pain, diarrhea, and nausea. Jerry Levin Affidavit ¶ 23. When he soiled himself with his feces, his captors mocked him and yelled at him. He told them he could

not help himself and asked to be allowed to go to the bathroom when he needed but his captors refused.  As a result, for several months, he lived in his own bodily discharge while seriously ill. Trial Tr. 41:2-22.  Eventually, his captors brought in a doctor to examine him.  *Id*.; Jerry Levin Affidavit ¶ 23.  Although the doctor left medication to treat Mr. Levin's symptoms, his captors withheld the medication and Mr. Levin's condition worsened. Trial Tr. at 41:23-42:19; Jerry Levin Aff. ¶ 23.  Days later, after Mr. Levin had fouled himself again, his captors brought the doctor back and Mr. Levin was finally given medicine. Trial Tr. at 41:23-42:19; Jerry Levin Aff. ¶¶ 24-25.

9.      In July 1984, while he was still ill, Mr. Levin was forced by his captors into a room and ordered to read a pre-written statement.  After Mr. Levin read the statement aloud as commanded, his captor told him to read it as if he were not afraid and shoved his fist into Mr. Levin's face. Trial Tr. 53:3-16.  Finally, Mr. Levin read the statement in what he hoped would appear to those viewing the tape as if he was being coerced. *Id*. at 53:20-55:9.  The statement was videotaped and sent to the U.S. Department of State. Jerry Levin Affidavit ¶ 32.  The statement, as read by Mr. Levin, was that unless the Kuwaiti government released 17 terrorists who had been convicted and sentenced to death for the bombing of the U.S. and French Embassies in Kuwait in December 1983, Mr. Levin would be killed. *Id.*  Mr. Levin believed that his captors would go through with their threat and kill him if their demands were not met. *Id.* ¶ 34. This led Mr. Levin to experience panic, terror, and a certainty that he was doomed, considering his belief in the improbability that the Kuwaiti government would concede to Hizbollah's demands. *Id.* ¶¶ 34-35; Trial Tr. at 51:7-52:17.

10.     During the time that Mr. Levin was held, Hizbollah was engaged in a

systematic kidnapping program under the supervision of Iran. Clawson Affidavit ¶¶ 15, 19-20.  Several other Americans in addition to Mr. Levin had also been kidnapped and were being held hostage by Hizbollah.  These individuals included Benjamin Weir, Peter Kilburn, Lawrence Martin Jenco, and CIA station chief William Buckley. *Id.* ¶ 19.  For at least some period of time, these other Americans were held in the same place as Mr. Levin. Jerry Levin Affidavit ¶¶ 28-29, 33, 38, 48.  As a result of hearing the other prisoners being taken to and from their cells and hearing his captors give them orders in English, Mr. Levin knew that they were also Americans. *Id.* ¶ 28, 38.  Mr. Levin was never allowed to see or communicate with the other hostages.  Trial Tr. at 31:1-3.

11.     On at least three occasions during his captivity, Mr. Levin was able to free himself from the chains around his wrist. *Id*. at 33:7-14.  However, he was malnourished and weak.  On two of these occasions, Mr. Levin was able to get the window open and look out.  When he saw that he was more than 25 feet off the ground, he realized that if he jumped from the window, he would most likely break his leg or ankle.  If he did injure himself, he knew that his captors would find him and kill him. *Id*. at 62:16-64:8.  He testified that although it was unbearably difficult, he had to put his chains back on when he realized that a successful escape was not feasible. *Id*.  However, he also testified that after he made the videotape, he knew that if he could not escape, he was going to die. *Id*. at 51:7-52:4.  He therefore made a decision to prepare himself for death, whether it was the result of his trying to escape, or by being executed when the Kuwaiti prisoners were executed.

12.     Mr. Levin testified that it was very important to him to keep track of the date, and that he made a mark on the wall every day, trying to keep a record of his days in

captivity. *Id.* at 46:14-47:8.  On February 14, 1985, Valentine's Day, Mr. Levin finally

escaped. Jerry Levin Affidavit ¶ 39.  He had been moved to a new house and this one had

a balcony with rails.  After working free of his chains, Mr. Levin waited until what he

thought was midnight, climbed out of the small window in his cell, which was over 20

feet high above street level, and slid down blankets he had knotted together and tied to

the balcony. *Id.* ¶ 43; Trial Tr. at 67:5-11.  He was barefoot, without money or papers,

and in a remote area in the mountains above the Bekaa Valley.  He knew he was in the

region occupied largely by Islamic religious fundamentalist Shiites, who were extremely

hostile to the United States.  He knew this in part due to his coverage of the area as a

journalist.  He also knew this due to the fact that he had purchased a three dimensional

map before he was taken hostage. Trial Tr. at 15:5-16:5.  He had placed the map in his

office at CNN in order to learn about the geography of the region where he was sending

reporters.  Due to his study of the map, he knew the Bekaa Valley was over the

mountains from Beirut and also that a main road ran through the Valley. *Id.* at 66:13-18.

When Mr. Levin jumped out of the window of his cell, he saw that he was in front of

barracks used by the Iranian Revolutionary Guard to train Hizbollah in terrorism

activities.  The gate to the compound was only one block from the house he had been

held in although no one from the barracks saw him escape. *Id.* at 66:1-12.

13.     Mr. Levin walked barefoot through the underbrush looking for the main

road.  His plan was to find a Syrian Army checkpoint, which he knew the Syrians had

throughout the area. *Id.* at 68:4-69:18.  Even though the United States and Syria did not

have diplomatic relations at the time, and in fact Syria was on the U.S. list of state

sponsors of terrorism against Americans, Mr. Levin believed that there was some chance

the Syrian army would not kill him or turn him back over to Hizbollah and that they

would instead take him to their senior officers, with whom he could plead for sanctuary.

*Id*.  He felt alone, weak, and frightened as he looked for Syrian soldiers. *Id*.  Mr. Levin

climbed down through the mountains in the middle of the night, hiding and listening.

After several hours, he finally reached the main road in the Bekaa Valley.  He was still at

a very high risk of getting caught by Hizbollah members or supporters and returned to his

captors.  He was dressed in torn and dirty clothes, and had an eleven and a half month old

beard.

14.     Once Mr. Levin reached the road, he heard voices from several directions

and saw flashlights.  He also heard dogs barking and thought his captors had found out

that he had escaped and were coming for him.  He also thought that he might be mistaken

for a burglar or a terrorist himself and shot as a result.  He saw an area where trucks were

parked, and he ran and hid underneath one of the trucks. Jerry Levin Affidavit ¶ 45; Trial

Tr. at 73:4-74.6.  As he lay on the ground, people converged on him shouting in Arabic.

He surmised they were saying something like, "Come out with your hands up."  Mr.

Levin testified he did not want to come out with his hands up because this was the way a

criminal acts and he was not a criminal.  However, he wanted to give some signal that he

was not a threat. When he crawled out from the truck, he stood up, held his arms and

hands out perpendicular to his body, and in French said, "Help me, help me." Trial Tr. at

74:22-75:22.  He could see nothing through the blinding flashlights that were being

pointed at him.

15.     The people who found Mr. Levin were in fact Syrian soldiers.  Mr. Levin

told them he had been a hostage, that he was a reporter with CNN, and that he wanted to

go to their commander.  It was now approximately 4:00 a.m.  The soldiers seemed to know about him and asked where he had been held.  He pointed to the mountains.  *Id*. at 76:12-77:16.  The soldiers agreed to take him to their commander.  However, the soldiers first led Mr. Levin to a metal warehouse with a pull down, locked gate.  Inside the warehouse were approximately 100 dirty, frightened people packed together in the dark.  The soldiers told Mr. Levin to go inside although he pleaded with them not to put him inside and said, "You told me you would take me to your commander."  The soldiers kept saying, "You go in there," and eventually Mr. Levin crawled in and was wedged between two men.  *Id*. at 77:22-78:23.  The warehouse was a local jail without lights or windows.  Everyone was kept in one area.  When Mr. Levin asked if anyone spoke English, he learned that a few individuals did.  Using his limited knowledge of French, Mr. Levin was able to learn this was the holding place for the drunks and other disturbers of the peace who were picked up by the soldiers.  The people in the jail asked Mr. Levin what his story was and appeared to have heard about his kidnapping.  *Id*.  At 9:00 a.m. the next morning, the soldiers came back and opened the gate to the warehouse.  Mr. Levin was then taken to a colonel in the Syrian army.  *Id*. at 78:24-79:13.

16.    Mr. Levin was interrogated by the Syrian colonel.  The colonel asked him where he had been held and if "the others" were there too.  Mr. Levin asked the colonel if more Americans had been kidnapped, and the colonel told him of Father Jenco and the others.  The colonel asked Mr. Levin if he could take the Syrians back to the house where he was held.  Mr. Levin testified that he did not want to go back, but that he felt he must do anything he could to help the other hostages.  He was afraid to trust the Syrians and did not know if they were really just going to turn him back over to Hizbollah, but he had

to take the chance. *Id*. at 82:13-83:19.  Mr. Levin took the colonel and other soldiers by truck to the place he was held and pointed it out.  However, the soldiers did not go into the house, and told Mr. Levin they were going to take him to Damascus. *Id.*

17.     Although he escaped from Hizbollah, Jerry Levin continues to suffer the effects of the torture and deprivation he suffered as well as the illnesses he contracted during his captivity. Jerry Levin Affidavit ¶¶ 49-52.  As a result of the severe ear infections, Mr. Levin is substantially deaf in both ears and has to wear hearing aids in both ears. *Id.* ¶ 27.  He has also had three complete eardrum replacement surgeries and three additional procedures to have drainage tubes inserted into his ears. *Id.* ¶ 49.  Since his release, Mr. Levin has had to see an ear doctor regularly and requires frequent antibiotic treatments. *Id.*  In addition, Mr. Levin has sought the help of psychological professionals in order to cope with the stress and trauma of his kidnapping. *Id.* ¶ 51.

18.     Mr. Levin has also been damaged professionally as a result of his being held hostage.  After his release, Mr. Levin was never again promoted at CNN, and eventually CNN let him go. Jerry Levin Affidavit ¶ 52.  His career as a major broadcast journalist was essentially over. *Id.*

**B.      Dr. Levin**

19.      Dr. Levin was in Beirut when her husband was kidnapped. Dr. Levin Affidavit ¶ 1.  On the morning of March 7, 1984, she kissed him good-bye and agreed to meet him at the CNN offices for lunch. *Id.* ¶ 3.  When she arrived at the CNN offices later that day, she was told that Mr. Levin had never showed up for work and was missing. *Id.*

20.     When Dr. Levin learned of her husband's kidnapping, she was devastated, depressed, terrified, and filled with anxiety and grief. *Id.* She did not know whether her husband was dead or alive. She was living in a foreign country in the middle of a Civil War. She did not know anyone or speak the language and feared for both her husband and for herself. *Id.* ¶¶ 3-4. She went to the police station for help, but was told that Mr. Levin had probably run off with another woman. She went to the hospital and checked beds full of injured and sick people to see if Mr. Levin was there. Finally, she went to the morgue, where she had to examine dead bodies to determine if her husband was one of them. Trial Tr. at 97:15-98:14.

21.     Despite her fear and desperation, during the entire 343 days of Mr. Levin's captivity, Dr. Levin worked tirelessly to gain information about where Mr. Levin was being held and who was holding him. Dr. Levin Affidavit ¶ 4; Bolling Affidavit ¶¶ 5-6. She depleted the family savings traveling to seek help and garner support, and payed informants for any bit of information about Mr. Levin's whereabouts in order to secure his release. Dr. Levin Affidavit ¶ 5; Bolling Affidavit ¶¶ 6-7. Dr. Levin and her family members spent nearly $200,000 paying con men that promised her information about her husband but never delivered on their promise. Dr. Levin Affidavit ¶ 9; Trial Tr. 107:5-108:21.

22.     Dr. Levin's fears and anxieties only increased when she found out that her husband was being held by Hizbollah. Dr. Levin Affidavit ¶¶ 6-7. Dr. Levin learned that Hizbollah was threatening to kill the American hostages unless 17 Shiite prisoners in Kuwait were released immediately. *Id.* ¶ 6. In June 1984, Dr. Levin learned from the U.S. State Department that the Kuwaiti government had set a date for the execution of the

Shiite prisoners. *Id.* ¶ 7.  She was absolutely terrified that her husband would be killed and worked frantically with friends and family to get in touch with the Kuwaiti government. *Id.*  The State Department told her that the Kuwaiti government had never before stayed an execution. *Id.*  Despite this, the impossible was accomplished and the Kuwaiti government ultimately agreed to stay the prisoners' execution. *Id.*

23.     In July of 1984, Dr. Levin received a call from the State Department; they had received a videotape from Mr. Levin's captors. *Id.* ¶ 8.  When Dr. Levin watched the video, she saw her husband looking tired, weak, severely ill, and desperately thin. *Id.* She heard him say that his life was dependent on the lives of several prisoners in Kuwait. *Id.*  Dr. Levin was filled with anguish, terror, and anxiety. *Id.*  She felt absolutely helpless. Trial Tr. at 109:13-110:10.

24.     Dr. Levin redoubled her efforts to obtain Mr. Levin's release. Dr. Levin Affidavit ¶ 9.  She went to the broadcast media and told her story to "The Today Show." She contacted and met with foreign dignitaries and officials, such as Ross Perot, Jesse Jackson, Princess Dina of Jordan, and Syrian Foreign Minister, Farouk al Sharaa. *Id.* ¶¶ 9-10; Bolling Affidavit ¶¶ 8-18.  When Dr. Levin went to Syria, she was told by the Government that she would be in danger and that she was on her own. Trial Tr. at 112:14-24.  Despite her efforts, Dr. Levin felt she was getting nowhere on obtaining Mr. Levin's release, and she grew more depressed, desperate, anxious, exhausted, and terrified that she would never see her husband alive again. Dr. Levin Affidavit ¶ 10.  Mr. Levin's family told Dr. Levin that since Mr. Levin was Jewish, he was no doubt going to be killed. Trial Tr. at 112:3-8.  She feared greatly that Islamic extremists would not hesitate to torture and kill her husband because he was Jewish.

25.     Dr. Levin also suffered financial and other stresses due to Mr. Levin's kidnapping.  For example, Mr. Levin had always been in charge of the family finances and bills, which were sent to him in Beirut.  On one occasion, American Express had a restaurant employee cut up Dr. Levin's credit card and tell her, "You don't have any credit." *Id*. at 102:8-25.  In addition, Mr. Levin had the check for his life insurance in his coat pocket when he was kidnapped, and as a result, the insurance company tried to cancel his insurance. *Id*. at 101:6-102:7.  These incidents caused additional anxiety for an already devastated wife.  Dr. Levin testified that she was in a state of psychological limbo.  She would not allow herself to believe Mr. Levin was dead, and therefore could not mourn.  Even when people told her that her husband was almost certainly dead, she could not "get on with life." *Id*. at 103:11-22.

26.     In November of 1984, Dr. Levin returned to the Middle East to continue her efforts. *Id*. at 112:12-13; Dr. Levin Affidavit ¶ 10.  At this time, she did not know whether Mr. Levin was still alive or if he had been murdered.  She did not know if he had died from his injuries, illness, or starvation. Dr. Levin Affidavit ¶ 10.  She sought an audience with Syrian President, Hafez Assad, and met several times with the Syrian Foreign Minister, Farouk al Sharaa, who promised to make inquiries and be in touch. *Id.* Dr. Levin remained in Syria for more than a month, and met several more times with the Foreign Minister, and with several anonymous strangers that Princess Dina, missionaries, and Middle East specialists sent her way. *Id.*  When nothing seemed to come of her efforts, Dr. Levin became more and more depressed. *Id.*  She fell and severely injured her ankle, and in early December, she collapsed. Trial Tr. at 114:20-115:8.  Dr. Levin received medical care in Syria and after recovering, decided to return to the United

States.  Her elderly mother was dying of cancer in Alabama.  She flew on Christmas Eve

of 1984, feeling alone and defeated. *Id.* at 115:18-116:2.

27.     Throughout the next months, Dr. Levin endured a repeating cycle of false

hope followed by severe disappointment, until she finally sought psychological help. Dr.

Levin Affidavit ¶¶ 10-11.  After her husband's release, Dr. Levin has had to continue

receiving regular, professional psychological care, including medication, to help her deal

with the trauma of her and her husband's ordeal. *Id.* ¶¶13-18; Trial Tr. at 118:9-120:11.

She has been diagnosed with Reacting Clinical Depression. Dr. Levin Affidavit ¶14; Trial

Tr. at 119:12-20.  In addition, both Mr. and Dr. Levin have had to see a marriage

counselor to deal with the stress that Mr. Levin's kidnapping and subsequent illnesses

have placed on their marriage. Dr. Levin Affidavit ¶ 16.

### Defendants

28.     Jeremy Levin was taken hostage in 1984 by Hizbollah, a radical Shiite

group.[1]  *See* Clawson Affidavit ¶ 15; s*ee also*  Jerry Levin Affidvait ¶¶ 30-31; Dr. Levin

Affidavit ¶ 6; Bolling Affidavit ¶ 16; U.S. Dep't of State, *Patterns of Global Terrorism*

*1985*, at 18 ("Hizballah factions kidnapped nearly a dozen Westerners in Lebanon in

1985, although two Americans - Jeremy [Jerry] Levin and the Reverend Benjamin Weir,

both seized in 1984 - escaped or were released.").  Mr. Levin testified that he was held by

Hizbollah terrorists trained by the Iranian Revolutionary Guard.  Trial Tr. at 23:2-25:12,

50:8-51:6.  Mr. Levin testified that he was imprisoned in the Bekaa Valley, which was a

---

[1] "There does not appear to be a consensus on the spelling of 'Hizbollah', as it is often
spelled 'Hezbollah' as well." *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27,
46 n.5 (D.D.C. 2001).  It is also spelled "Hizballah."

stronghold of the radical Islamic fundamentalists, Hizbollah.  Mr. Levin's final prison was across the street from the Revolutionary Guard barracks. *Id*. at 66:1-12.

29.     One of the defendants, Iran, has been designated a state sponsor of terrorism pursuant to section 6(i) of the Export Administration Act of 1979, 50 App. U.S.C. 2405(i), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C.§ 2371, since January 19, 1984.

30.     The other two defendants, MOIS and IRGC, are both Iranian intelligence and military services that function within and beyond Iranian territory.  The MOIS and IRGC have been major institutions through which the Iranian government has provided financial, technical, and material support for terrorism, including the holding of hostages such as Jerry Levin in Lebanon. Clawson Affidavit ¶ 15.

31.     Hizbollah was trained, supported, aided, abetted and funded by the Iranian government through MOIS and IRGC, and otherwise would not have had the expertise and skills needed to hold Jerry Levin captive while eluding the extensive search efforts of the U.S. and others. *Id*.

32.     Jerry Levin's capture and incarceration was part of a systematic plan orchestrated by agencies of the Iranian government, in particular MOIS and IRGC.  The MOIS and IRGC funded, supported and trained Hizbollah, directed their hostage-taking activities, and provided "cover" for Hizbollah so that the hostages would not be discovered. *Id*. ¶ 20.  Mr. Levin was the first in a long line of hostages taken by Hizbollah at the direction and instigation of the Iranian government, the MOIS, and the IRGC. *Id*.

## CONCLUSIONS OF LAW

### A.    Subject Matter Jurisdiction

33.    This action is brought against a foreign state and its intelligence services acting as its agents, under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 *et seq*., as amended ("FSIA").[2]  This Court has jurisdiction over this matter under the FSIA.  *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 10-11 (D.D.C. 1998).  *See also* 28 U.S.C. § 1330(a); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983).

34.    In the Anti-Terrorism and Effective Death Penalty Act of 1996, Congress lifted the immunity of foreign states officially designated by the Department of State as terrorist states, if the foreign state commits a terrorist act or provides material support and resources to an individual or entity which commits such an act which results in the death or personal injury of a United States citizen.  *See* 28 U.S.C. § 1605(a)(7); *Flatow*, 999 F. Supp. at 12.  Congress has expressly directed the retroactive application of 28 U.S.C. § 1605(a)(7):

> The amendments made by this subtitle shall apply to any cause of action arising before, on, or after the date of the enactment of this Act [Apr. 24, 1996].

Pub. L. No. 104-132, § 221(c); 110 Stat. 1214, 1243 (1996).  *See also Flatow*, 999 F. Supp. at 13.

35.    In order to establish subject matter jurisdiction pursuant to 28 U.S.C. § 1605(a), a claim must contain the following statutory elements:

> (1) that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking; and

---

[2] All references to the United States Code are to the electronic versions that appear in Lexis or Westlaw.

(2) the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; and

(3) the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment; and

(4) that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

(5) if the incident complained of occurred with [sic] the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter; and

(6) either the plaintiff or the victim was a United States national at the time of the incident; and

(7) similar conduct by United States agents, officials, or employees within the United States would be actionable.

*See Flatow*, 999 F. Supp. at 16.

36.     These statutory elements have been held to be satisfied in other cases where Hizbollah, sponsored by Iran and MOIS, held Americans like Mr. Levin hostage in Lebanon.  *See, e.g.*, *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 68 (D.D.C. 1998); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 33 n.7 (D.D.C. 2001).

37.     Sections 1605(e)(1) and (2) of the FSIA provides guidance with regard to interpreting the terms "torture" and "hostage taking."

"Torture," under 28 U.S.C. § 1605(e)(1) is defined as:

(1) [T]he term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing

that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from--

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1605(e)(1), citing to section 3 of the Torture Victim Protection Act of 1991,

P.L. 102-256, 106 Stat 73 (1992).

"Hostage taking" is defined as:

Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an intentional intergovernmental organization, a natural or juridical persona, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages within the meaning of this Convention.

28 U.S.C. §1605(e)(2), citing to Article 1 of the International Convention Against the

Taking of Hostages.

38.     Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1), Mr. Levin was a

victim of "torture" as defined in section 3 of the Torture Victim Protection Act of 1991,

P.L. 102-256, 106 Stat. 73 (1992).

39.     Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(2), Mr. Levin was a victim of "hostage taking" as defined in Article 1 of the International Convention Against the Taking of Hostages.

40.     Mr. Levin has suffered "personal injury" as a result of Defendants' action and activities as defined in 28 U.S.C. § 1605(a)(7).

41.     28 U.S.C. § 1605(a)(7) adopts the definition of "material support or resources" set forth in the federal criminal code, 18 U.S.C. § 2339A:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

42.     This Court in *Flatow* held that the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes "providing material support or resources" for a terrorist act within the meaning of 28 U.S.C. § 1605(a)(7). *Flatow*, 999 F. Supp at 17-18.  Further, the *Flatow* court found that "a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises in order to satisfy 28 U.S.C. § 1605(a)(7)'s statutory requirements for subject matter jurisdiction.  Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient to invoke jurisdiction." *Id.* at 18.

43.     It has been well established within the intelligence, academic, and legal communities that Iran, the MOIS, and the IRGC were providing material support and

resources to Hizbollah in the early 1980's.  *See, e.g.*, *Cicippio*, 18 F. Supp. 2d at 68 ("Iran . . . openly provided 'material support or resources' to Hizballah . . . ."); *see also Jenco*, 154 F. Supp. 2d 33 n.7 ("Iran and the Iranian MOIS provided 'material support or resources' to Hizbollah . . ."); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 111 (D.D.C. 2005) ("With the support of the MOIS and the IRGC, Hizbollah undertook a series of terrorist acts directed at Westerners in the early 1980s."); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 51 (D.D.C. 2003) ("Hezbollah is . . . the name of a group of Shi'ite Muslims in Lebanon that was formed under the auspices of the government of Iran."); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 293 n.5 (D.D.C. 2003) ("[I]t is now the universally held view of the intelligence community that Iran was responsible for the formation, funding, training, and management of Hizbollah.") (quoting *Higgins v. Islamic Republic of Iran*, 2000 WL 33674311 (D.D.C.2000)); Clawson Affidavit ¶¶ 15, 20.

44.     "The law of *respondeat superior* demonstrates that if a foreign state's agent, official or employee provides material support and resources to a terrorist organization, such provision will be considered an act within the scope of his or her agency, office or employment." *Flatow*, 999 F. Supp. at 18.

45.     "[I]f a foreign state's heads of state, intelligence service, and minister of intelligence routinely provide material support or resources to a terrorist group, whose activities are consistent with the foreign state's customs or policies, then that agent and those officials have acted squarely within the scope of their agency and offices within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A § 1605 note." *Id.*

46.     The courts have consistently found in other hostage cases that agents and officials of the Iranian government, the MOIS, and the IRGC were acting within the scope of their agency and offices in providing material support and resources to Hizbollah.  *See*, *e.g.*, *Flatow*, 999 F. Supp. at 18; *Cicippio*, 18 F. Supp. 2d at 68.

47.     Iran has been designated a state sponsor of terrorism by the Department of State since January 1984.  *See* 49 Fed. Reg. 2836-02 ("In accordance with Section 6(i) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(i), I [Sec. of State George P. Schultz] hereby determine that Iran is a country which has repeatedly provided support for acts of international terrorism.").

48.     In addition, it has been held that the MOIS and IRGC "must be treated as the state of Iran itself rather than as its agent." *Salazar*, 370 F. Supp. 2d at 116.

49.     Mr. Levin was kidnapped in Beirut, Lebanon, not within the territory of Iran. Jerry Levin Affidavit ¶ 6 (Ex. B to Smith Decl.).  Therefore, under 28 U.S.C. § 1605(a)(7), Plaintiffs did not need to offer Defendants an opportunity to arbitrate.

50.     Plaintiffs were both residents of Washington D.C. before moving to Lebanon, and both were U.S. nationals at the time the acts occurred. Jerry Levin Affidavit ¶ 4 (Ex. B to Smith Decl.); Dr. Levin Affidavit ¶ 2 (Ex. C to Smith Decl.).

51.     As recognized by the Court in *Cicippio*, *Flatow*, and dozens of other hostage cases, subject matter jurisdiction is established under 28 U.S.C. § 1605(a)(7), and Defendants Iran, the MOIS, and the IRGC, as sponsors of Hizbollah, are responsible for the personal injuries inflicted upon by Hizbollah on hostages and their families, such as Mr. and Dr. Levin.  *See e.g.*, *Flatow*, 999 F. Supp. at 18; *Cicippio*, 18 F. Supp. 2d at 68; *Sutherland*, 151 F. Supp. 2d at 47.

**B.**     **Personal Jurisdiction**

52.     "The FSIA provides that personal jurisdiction over defendants will exist where Plaintiff establishes the applicability of an exception to immunity pursuant to 28 U.S.C. § 1604, § 1605, or § 1607 and service of process has been accomplished pursuant to 28 U.S.C. § 1608." *Flatow*, 999 F. Supp. at 19.  Service of process has been accomplished in this case and as set forth above, Defendants fall within an exception to immunity pursuant to 28 U.S.C. § 1607(a)(7).

53.     The FSIA provides that *in personam* jurisdiction over a foreign stated defendant has been accommodated inherently in the statute for the acts enumerated in 28 U.S.C. §§ 1605(a)(7).  *See* H. Rep. 94-1487 at 13-14 (1976), reprinted at 1976 U.S.C.C.A.N. at 6611-12.

54.     The court in *Flatow* held that the exercise of personal jurisdiction over foreign state sponsors of terrorism which cause the personal injury or death of United States nationals is proper under the Constitution. *Flatow*, 999 F. Supp. at 19-23.

**C.**     **Venue**

Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which states:

> A civil action against a foreign state as defined in section 1603(a) of this title may be brought . . . in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

28 U.S.C. § 1391(f)(4).

**D.**     **Liability**

55.     Federal district courts presiding over similar cases have repeatedly held that Iran is liable to victims of state sponsored terrorism, including terrorist acts committed in Lebanon by Hizbollah.  *See, generally*, *Flatow*, 999 F. Supp. 1; *Cicippio*,

18 F. Supp. 2d 62; *Sutherland*, 151 F. Supp. 2d 27; *Jenco*, 154 F. Supp. 2d 27; *Peterson*, 264 F. Supp. 2d 46.

56.     "Should an exception to the FSIA apply and a foreign state have no sovereign immunity as to a given claim, 'the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages.'" *See Salazar*, 370 F. Supp. 2d at 112 (*quoting* 28 U.S.C. § 1606).

57.     Victims of state-sponsored terrorism have a valid claim against designated sovereigns under state and/or federal common law.  Plaintiffs may proceed with claims against Iran, IRGC, and MOIS under the laws of the District of Columbia, Plaintiffs' last state of domicile prior to moving to Beruit.  *See Salazar*, 370 F. Supp. 2d at 14; *see also Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at *22; Jerry Levin Affidavit ¶ 4; Dr. Levin Affidavit ¶ 2.

58.     Here, Plaintiffs have established their right to relief under the common law of the District of Columbia.

## I.     <u>False Imprisonment</u>

59.     "'[T]he unlawful detention of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion . . . by actual force, or by fear of force, or even by words' constitutes false imprisonment." *Dent v. May Dept. Stores Co*., 459 A.2d 1042, 1044 (D.C. 1982).

60.     Hizbollah intentionally and unlawfully used force and threat of force to restrain, detain, and confine Jerry Levin for 343 days, from March 7, 1984 to February 14, 1985. Jerry Levin Affidavit ¶¶ 6, 43.  As described in detail by Mr. Levin, both

during his live testimony and in his affidavit, Mr. Levin was forced into a car in Beirut at gunpoint by members of Hizbollah. *Id.* ¶ 6.  The terrorists held him at an unknown location in Beirut before transporting him to the Bekka Valley, where he was chained to the floor while being held in a succession of small cells. *Id.* ¶¶ 9-14.  Mr. Levin was let out of his cell once a day to use the restroom at which times he was always escorted by an armed guard. *Id.* ¶ 19.  As a direct and proximate result of Hizbollah's unlawful restraint and confinement of Jerry Levin, Mr. Levin sustained serious physical and psychological injuries for which he continues to require medical treatment, and has lost his career as a professional news correspondent. *Id.* ¶¶ 49-52.

61.     These acts are attributable to Defendants because Defendants substantially funded and controlled Hizbollah.  As such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability.  *See Jenco*, 154 F. Supp. at 34-35; *see also Sutherland*, 151 F. Supp. 2d at 49; *Flatow*, 999 F. Supp. at 26-27.

**II.   Battery**

62.     "To establish liability for the tort of battery in the District of Columbia, a plaintiff must plead and prove 'an intentional, unpermitted, harmful or offensive contact with his person or something attached to it.'"  *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 275 (D.D.C. 2005) (*quoting Marshall v. Dist. of Columbia*, 391 A.2d 1374, 1380 (D.C.1978)).

63.     Mr. Levin suffered harmful contact at the hands of Hizbollah.  As described in detail by Mr. Levin, both during his live testimony and in his affidavit, Mr. Levin was pulled off of a Beirut street at gunpoint, shoved into a car, bound and gagged, and wrapped from head to toe in packing tape. Jerry Levin Affidavit ¶¶6-13.  His captors

beat him throughout his captivity, including jumping up and down on his legs, *id.* ¶¶ 9,

18, 40; and kept him chained to a wall, *id*. ¶¶ 14-15.  His captors would shove unloaded

pistols against Mr. Levin's neck or underneath his blindfold so he could see the barrel,

and pull the trigger. *Id.* ¶ 20.  As a direct and proximate result of Hizbollah's battery of

Jerry Levin, Mr. Levin sustained serious physical and psychological injuries for which he

continues to require medical treatment, and has lost his career as a professional news

correspondent. *Id*. ¶¶ 49-52.

64.     These acts, which were intentionally committed by Mr. Levin's captors,

are attributable to Defendants because Defendants substantially funded and controlled

Hizbollah.  As such, Defendants are liable under the tort doctrines of *respondeat superior*

and joint and several liability.  *See Jenco*, 154 F. Supp. at 34; *see also Sutherland*, 151 F.

Supp. 2d at 48; *Flatow*, 999 F. Supp. at 26-27.

### III.     Assault

65.     "[A]n assault may be defined as an intentional and unlawful attempt or

threat, either by words or by acts, to do physical harm to the victim." *Etheredge v. Dist.*

*of Columbia*, 635 A.2d 908, 916 (D.C. 1993).

66.     As described in detail by Mr. Levin, both during his live testimony and in

his affidavit, Mr. Levin's captors constantly threatened beat and kill him if he did not

obey their commands. Jerry Levin Affidavit ¶¶ 18-20, 40.  As the court recognized in

*Sutherland*, hostages like Mr. Levin "lived . . . in an environment where, at any moment,

he might find himself harassed or beaten for virtually no reason at all" and "[i]n this

sense, it is not a gross exaggeration to suggest that [he] withstood a continuous . . .

assault." *Sutherland*, 151 F. Supp. 2d at 48.  At all times during his captivity, Mr. Levin

believed that his captors would carry out their threats to hit or even kill him, and he lived

in constant fear of immediate bodily harm at the hands of his captors. Jerry Levin

Affidavit ¶¶ 18, 34-35.  As a direct and proximate result of Hizbollah's assault of Jerry

Levin, Mr. Levin sustained serious physical and psychological injuries for which he

continues to require medical treatment, and has lost his career as a professional news

correspondent. *Id.* ¶¶ 49-52.

67.     These acts, which were intentionally committed by Mr. Levin's captors,

are attributable to Defendants because Defendants substantially funded and controlled

Hizbollah.  As such, Defendants are liable under the tort doctrines of *respondeat superior*

and joint and several liability.  *See Jenco*, 154 F. Supp. at 34; *see also Sutherland*, 151 F.

Supp. 2d at 49; *Flatow*, 999 F. Supp. at 26-27.

## IV.     Intentional Infliction of Emotional Distress

68.     "The tort of [Intentional Infliction of Emotional Distress or] IIED requires

a showing of '(1) extreme and outrageous conduct on the part of the defendant which (2)

intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Dammarell*,

404 F. Supp. 2d at 275 (quoting *Howard University v. Best*, 484 A.2d 958, 985

(D.C.1984)).

69.     District courts have held that "[t]errorist acts, by their nature, are

intentionally designed to inflict harm, and thereby to cause severe emotional distress."

*Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 104 (2006).  Moreover, "the

act of engaging in terrorism by means of material support and civil conspiracy is extreme,

outrageous, and goes beyond all possible bounds of decency.  Terrorists seek to cause

extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately outrageous." *Id.*

70.     Hizbollah intentionally kidnapped Mr. Levin and held him hostage for 343 days.  This conduct "quite easily qualifies as extreme and outrageous." *Jenco*, 154 F. Supp. 2d at 35.  As a direct and proximate result of such conduct, Mr. Levin suffered extreme emotional distress both during his captivity and after his escape, and has sought and continues to seek professional psychological treatment to help him cope with the mental distress and trauma of his captivity. Jerry Levin Affidavit ¶ 51 (Ex. B to Smith Decl.).  Such emotional distress has also resulted in the loss of Mr. Levin's career as a professional news correspondent. *Id.* ¶ 52.

71.     With regard to the effect of the IIED on Dr. Levin, "[c]ourts have uniformly held that a terrorist attack - by its nature - is directed not only at the victims but also at the victims' families." *Salazar*, 370 F. Supp. 2d at 115 n.12.  "When an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostages' immediate family.  Further . . . an organization taking someone hostage implicitly believes that such emotional distress is substantially certain to result." *Sutherland*, 151 F. Supp. 2d at 50.  Because the District of Columbia recognizes the existence of a cause of action for intentional infliction of emotional distress for members of the victim's immediate family, *Peterson v. Islamic Republic of Iran*, - - - F. Supp. 2d - - - , 2007 WL 2563441, at *6 (D.D.C. Sept. 7, 2007) (citing *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 334-35 (D.D. Cir. 2003)), both Mr. Levin and Dr. Levin may recover.

72.     In some sense, the families of terrorist captives, particularly the spouses, suffer at least as much if not more than the hostages themselves.  The spouse does not know if her partner is alive or dead.  She cannot mourn, for she hopes he lives.  Yet hope is truly irrational, and the safe return of a terrorist captive is unlikely.  The spouse cannot rebuild a separate live and is caught in an almost unique state of agonizing limbo.  Dr. Levin spent the entire 343 days of her husband's captivity fearing for his life and vacillating wildly between hope and despair. Dr. Levin Affidavit ¶ 4 ; Bolling Affidavit ¶ 6.  She was consumed by the terrifying thought that she might never see her husband again, yet not knowing whether he was alive or dead, she worked tirelessly and spent all of their savings attempting to find her husband and secure his release. Dr. Levin Affidavit ¶ 5; Bolling Affidavit ¶¶ 11-12.  In a further act of terrorism, Defendants tape recorded Mr. Levin in an extremely vulnerable and debilitated state and forced him to read a prepared statement indicating that he would be killed if convicted terrorists held in Kuwait were not released. Jerry Levin Affidavit ¶ 32.  Hizbollah released the videotape, which was viewed by Dr. Levin. Dr. Levin Affidavit ¶ 8.  Dr. Levin watched the videotape of her husband, and her fear intensified when she observed his emaciated state and disheveled appearance. *Id*.  Dr. Levin was so consumed by fear that she needed professional psychological treatment to help her deal with the mental distress and trauma of living through her husband's captivity. *Id*. ¶¶ 17-19.

73.     Hizbollah's actions were deliberate and outrageous, and intended to cause severe emotional distress to Mr. Levin and his wife, and it did in fact cause such severe emotional distress.  *See Greenbaum*, 451 F. Supp. 2d at 104; *see also Sutherland*, 151 F. Supp. 2d at 50.  These acts, which were intentionally committed by Mr. Levin's captors,

are attributable to Defendants because Defendants substantially funded and controlled

Hizbollah.  As such, Defendants are liable under the tort doctrines of *respondeat superior*

and joint and several liability.  *See Jenco*, 154 F. Supp. at 35; *see also Sutherland*, 151 F.

Supp. 2d at 49-50; *Flatow*, 999 F. Supp. at 26-27.

### V.    <u>Negligence</u>

74.    "The plaintiff in a negligence action bears the burden of proof on three

issues: the applicable standard of care, a deviation from that standard by the defendant,

and a causal relationship between that deviation and the plaintiff's injury." *Etheredge*,

635 A.2d at 917.  "A uniform standard of care applies in actions for negligence:

reasonable care under the circumstances." *Battle v. Thornton*, 646 A.2d 315, 319 (D.C.

1994).

75.    Hizbollah breached its duty of reasonable care to Mr. Levin by depriving

Mr. Levin of adequate food, light, toilet facilities, and medical care. Jerry Levin Affidavit

¶¶ 21-27.  As a direct and proximate result of the deplorable conditions in which

Hizbollah held Mr. Levin, Mr. Levin developed severe and life-threatening illnesses and

infections, including a severe ear infection that has left him almost deaf in both ears and

hepatitis. *Id.* ¶¶ 26-27.

76.    These acts, which were committed by Mr. Levin's captors, are attributable

to Defendants because Defendants substantially funded and controlled Hizbollah.  As

such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and

several liability.  *See Flatow*, 999 F. Supp. at 26-27.

### VI.    <u>Loss of Consortium</u>

77.     In the District of Columbia, a spouse may recover for loss of consortium "where the plaintiff proves an actual loss of services or affection as a result of an actionable tort against his or her spouse even though the latter has suffered no physical injury." *Crowley v. North American Telecomm. Ass'n*, 691 A.2d 1169, 1175 (D.C. 1997). Plaintiffs in other hostage cases have been awarded damages for loss of consortium. *See, e.g.*, *Cicippio*, 18 F. Supp. 2d at 70; *Sutherland*, 151 F. Supp. 2d at 51.

78.     Hizbollah intentionally inflicted extreme emotional distress on Dr. Levin by kidnapping and holding her husband hostage for 11 months.  Dr. Levin's extreme emotional distress has deprived Mr. Levin of his wife's services, affection, society, and companionship, and exacted a toll on Plaintiffs' marital relationship.  As a result, Plaintiffs' have required continual counseling to deal with the stress placed on their relationship. Dr. Levin Affidavit ¶¶ 13-18; Jerry Levin Affidavit ¶ 51.

79.     Mr. Levin's Hizbollah captors caused Dr. Levin to be deprived of Mr. Levin's services, affection, society, and companionship for the 343 days in which her husband was held captive. Dr. Levin Affidavit ¶¶ 3-4.  Even following Mr. Levin's release, the stress and trauma of his captivity has continued to exact a toll on their marital relationship, and Plaintiffs have required continual counseling to deal with the stress placed on their relationship. *Id.* ¶¶ 13-18; Jerry Levin Affidavit ¶ 51.

80.     These acts, which were committed by Mr. Levin's captors, are attributable to Defendants because Defendants substantially funded and controlled Hizbollah.  As such, Defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability.  *See Flatow*, 999 F. Supp. at 26-27.

E.    **Damages**

81.    "The Foreign Sovereign Immunities Act specifically permits plaintiffs suing under section 1605(a)(7) to pursue 'money damages which may include economic damages, solatium, pain, and suffering.'" *Sutherland*, 151 F. Supp. 2d at 50-51; *see also* 28 U.S.C. § 1605 note.  Plaintiffs are not seeking to recover punitive damages. 28 U.S.C. 1606 ("[A] foreign state . . . shall not be liable for punitive damages.").  *See also Salazar*, 370 F. Supp. 2d at 116 (declining plaintiff's prayer for punitive damages against Iran, the MOIS, and the IRGC).

82.    It is firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering. *Leeper v. United States*, 756 F.2d 300, 307-08 (3d Cir. 1985).  However, plaintiffs must still satisfy the court's need to assure "that the projected consequences are 'reasonably certain' (i.e., more likely than not) to occur," and that the amount of damages was derived "by a 'reasonable estimate.'" *Hill v. Republic of Iraq*, 328 F. 3d 680, 684 (D.C. Cir. 2003).

83.    Mr. Levin seeks $202,003 for past and future medical expenses and Dr. Levin seeks $446,604 for past and future medical expenses.  However, the only evidence submitted by plaintiffs in support of their request was that of their own affidavits and testimony at trial.  Thus, while the Court concludes that both plaintiffs, through their own testimony, have reasonably proven the costs incurred as a result of past medical expenses, the Court cannot make such a conclusion as to plaintiffs' future medical expenses.  *See Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 275 (D.D.C. 2003) (court held that requested damages for plaintiff's past medical expenses had been "reasonably proven" through testimony of his mother).  *See also Nikbin v. Islamic Republic Iran*, ---

F. Supp. 2d ---, 2007 WL 2828010, at *3-*4 (D.D.C. Sept. 28, 2007) (testimony of plaintiff's treating psychiatrist offered in support of claim for past and future medical expenses); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120 (D.D.C. 2005) (testimony of board-certified psychiatrist offered in support of claims for past and future medical expenses).

84.     Mr. Levin also seeks 2.9 million for lost earnings.  Again, however, the only evidence submitted was that of Mr. Levin's affidavit, which in turn was based on his own personal estimates of lost past wages and lost future earnings.  Where awards have been made for such economic losses, the court has had before it the testimony of an expert in the field.  Thus, the court cannot therefore award economic damages based on the record before it.  *See Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 51 (D.D.C. 2006) (court awarded damages for lost wages based on expert testimony of forensic economist); *Salazar*, 370 F. Supp. 2d at 116 (award of damages for lost wages and benefits based on expert's calculation); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 63 (D.D.C. 2003) (expert economist testified as to economic loss caused by the murder of plaintiff's husband).

85.     Finally, both Mr. and Doctor Levin seek damages for pain and suffering, extreme emotional distress, and loss of society.  Mr. Levin seeks $25 million and Dr. Levin seeks $15 million.

86.     In cases involving the compensation of kidnapping victims, courts have awarded damages for pain and suffering based on a per diem calculation of $10,000 per day of captivity.  In cases like that of Mr. Levin, where the pain and suffering is heightened by tortuous acts, courts have added a lump sum award to the per diem

amount, in order to fully compensate the victim.  Thus, in Mr. Levin's case, the court will

award a per diem amount of $3,430,000 ($10,000 multiplied by the 343 days of Mr.

Levin's captivity).  To that amount, the court will add the lump sum of $15 million, in

order to more fully compensate Mr. Levin for the brutal treatment he received during his

captivity.  *See Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 234-35 (D.D.C.

2002) (court awarded lump sum of $1.2 million in compensatory damages to hostage who

was held captive for four days and who suffered severe beatings during that time); *Surette*

*v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 264-69 (D.D.C. 2002) (court awarded

per diem amount of $4,440,000 plus lump sum of $1 million in compensatory damages to

the estate of a hostage who was held for 14 months prior to his death); *Cicippio v. Islamic*

*Republic of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C. 1998) (court awarded lump sum of $6.1

million in compensatory damages to hostage who was held captive for 532 days and who

suffered regular beatings).

87.     In cases involving the compensation of the spouses of kidnapping victims

who survive, this Court has awarded $10 million in solatium[3] damages.  *See Acree*, 271

F. Supp. 2d at 22 (court awarded $10 million in solatium damages to each spouse of

surviving victim); *Cicippio*, 18 F. Supp. 2d at 65-67 (court awarded $10 million in

solatium damages to each spouse of surviving victim).

88.     Based on the foregoing, judgment is therefore, hereby, entered in favor of

Plaintiffs Jerry and Lucille Levin and against Defendants Iran, MOIS, and IRGC, jointly

and severally as follows:

a.      For Plaintiff Jerry Levin:

---

[3] "In the context of FISA cases, this Court has recognized the claim of solatium as . . . indistinguishable from the claim of intentional infliction of emotional distress." *Surette*, 231 F. Supp. 2d at 267 n.5.

      i.        $3,430,000 ($10,000 multiplied by the 343 days of Mr.

Levin's captivity) in per diem compensatory damages for

pain and suffering, extreme emotional distress, and loss of

society,

      ii.      $15 million lump sum in additional compensatory damages

for pain and suffering, extreme emotional distress, and loss

of society, and

      iii.    $76,935 for past medical expenses.[4]

b.     For Plaintiff Dr. Levin:

      i.        $10 million lump sum for pain and suffering, extreme

emotional distress, and loss of society, and

      ii.      $300,784 for past medical expense.[5]

Therefore, judgment is hereby entered in favor of Plaintiff Jerry Levin and against

Defendants Iran, MOIS, and IRGC, jointly and severally, in the total amount of

$18,506,935.  Judgment is hereby entered in favor of Plaintiff Dr. Levin and against

Defendants Iran, MOIS, and IRGC, jointly and severally, in the total amount of

$10,300,784.

**SO ORDERED.**

Date:  December 31, 2007             _____/S/_____

                                  JOHN M. FACCIOLA
                                  UNITED STATES MAGISTRATE JUDGE

---

[4] See Attachment A.
[5] See Attachment B.