## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JEREMY LEVIN and DR. LUCILLE LEVIN,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 05-2494 (JEB)** |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.*, | |
| **Defendants.** | |
| **JAMES OWENS,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 21-126 (JEB)** |
| **REPUBLIC OF SUDAN,** *et al.*, | |
| **Defendants.** | |
| **JUDITH ABASI MWILA,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 21-127 (JEB)** |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.*, | |
| **Defendants.** | |
| **RIZWAN KHALIQ,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 21-128 (JEB)** |
| **REPUBLIC OF SUDAN,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

Plaintiffs in these consolidated cases have obtained nearly $1 billion in judgments against Iran in connection with terrorist incidents.  Given the lack of certain countries' assets in the United States that these and other victims could attach, Congress established the United States Victims of State Sponsored Terrorism Fund, which pays claimants a share of their recoveries. While waiting their turn, Plaintiffs here have seized on a novel idea: they seek to recover $10 million in separate funds that Wells Fargo Bank has blocked in connection with an Iranian front company's attempted purchase of a petroleum tanker.  Having already been granted writs of attachment by courts in this district, several Plaintiffs now move for final orders of condemnation and recovery against the funds, which Wells Fargo still retains.

These Plaintiffs are not the only ones with their eyes on this prize.  Three weeks before the first group filed their writs (in cases then pending before other judges), the United States initiated a separate forfeiture action against the funds.  In fact, Plaintiffs learned of the existence of the funds as a result of that suit and the subsequent publicity.  In the forfeiture case, which was assigned to this Court, the Government seeks to recover the money and deposit it in the Victims Fund, thereby maintaining the orderly and equitable process for compensating all claimants holding judgments against state sponsors of terrorism.  Hoping to preserve its ability to obtain clean title in its forfeiture action, the Government intervened in the above-captioned cases and moved to quash Plaintiffs' writs of attachment.  Now presiding over those cases, this Court concludes that Plaintiffs' writs cannot stand because Iran does not have an attachable property interest in the funds.  The Court will accordingly grant the Government's Motions to Quash and deny Plaintiffs' condemnation Motions.

## I.      Background

### A.  Factual Background

#### 1.  *Plaintiffs' Judgments*

Although there are many individual Plaintiffs with unsatisfied judgments against Iran represented here, the four cases addressed by this Opinion can be grouped into two buckets. First, Plaintiffs' claim in Levin, No. 05-2494, stems from the 1984 kidnapping and torture of Jeremy Levin by the Iran-backed terrorist group Hezbollah.  See No. 05-2494, ECF No. 23 (Levin Report and Recommendation).  Although these Plaintiffs have collected a portion of their judgment amounts, they are still owed over $15 million including post-judgment interest.  Id., ECF No. 34-2 (Levin Mot. for Writ of Attachment) at 4.

Second, Plaintiffs in Nos. 21-126, 21-127, and 21-128 (the Owens Plaintiffs) are those injured and killed by al Qaeda's 1998 suicide bombings of U.S. embassies in Kenya and Tanzania.  In 2011, Judge John D. Bates of this district found Iran liable for their damages because it had "provided material aid and support to al Qaeda."  Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 135 (D.D.C. 2011).  He eventually entered judgments against Iran totaling nearly $1 billion.  See Judgment, Owens, No. 01-2244 (D.D.C. Mar. 28, 2014), ECF No. 301; Judgment, Mwila v. Islamic Republic of Iran, No. 08-1377 (D.D.C. Mar. 28, 2014), ECF No. 88; Judgment, Khaliq v. Republic of Sudan, No. 10-356 (D.D.C. Mar. 28, 2014), ECF No. 40. Those judgments remain entirely unpaid.

#### 2.  *The Blocked Funds*

The story of how the funds at issue here arrived on the scene and came to be blocked at Wells Fargo is set out in the affidavits and verified complaint submitted by the Government in its

forfeiture action.  See United States v. $2,340,000.00 Associated With Petroleum Tanker Nautic,

No. 20-1139.  Plaintiffs in our four cases do not challenge this account.

Sometime during 2019, two Iranian individuals with ties to government entities created a

front company known as Taif Mining Services in order to facilitate transactions otherwise barred

by U.S. sanctions.  See No. 21-126, ECF No. 4-2, Exh. H (Forfeiture Complaint), ¶¶ 18, 26–27.

It is undisputed that Taif qualifies as an agent or instrumentality of Iran, such that judgments

against Iran are enforceable against it.  Id., ECF No. 4 (Owens Mot. to Quash) at 14 n.9;

Terrorism Risk Insurance Act, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002).

Shortly after its creation, Taif, which purported to be an Omani company, was used as a shell

buyer in the purchase of an oil tanker from a Greek company known as Crystal Holdings.  See

Forfeiture Complaint, ¶¶ 29–30.  The Iranians planned to use the tanker, named the Nautic, to

illicitly transport oil in coordination with Iran's state-owned oil company.  Id., ¶¶ 42–45.

Taif agreed to pay Crystal Holdings for the Nautic by using a British legal and consulting

firm, Holman Fenwick Willan LLP (HFW), as escrow agent.  See No. 21-126, ECF No. 4-1,

Exh. E (Escrow Holding and Release Agreement).  On or before September 10, 2019, Taif

deposited $2.34 million with HFW as a 20% down payment.  Id., Exh. A (Affidavit), ¶ 49.  HFW

then transferred that payment to Crystal Holdings without incident.  In late October, Taif

deposited the balance of the purchase price — $9,983,931.91 — with HFW and instructed it to

initiate another electronic funds transfer (EFT) of that amount to Crystal Holdings.  Id., Exh. F

(Release Instruction).  That EFT was not as successful; it was blocked midstream at Wells Fargo

and never made it to Crystal Holdings.  See Affidavit, ¶ 53.  This is the sum that all parties seek

in this case.

While cash transfers appear rather simple to those of us who manage such transactions with a single keystroke, much goes on that does not meet the eye, particularly when international transfers of large amounts are involved.  To understand Wells Fargo's role requires some granular detail on the general mechanics of EFTs, which the D.C. Circuit has previously provided:

> An electronic funds transfer is a series of transactions by which one party, called the "originator," transfers money through the banking system to another party, called the "beneficiary."  See U.C.C. § 4A-104(a).  Suppose O wants to transfer $100 to B.  If O and B have an account at Bank X, then the transaction is simple.  O can instruct Bank X, which will debit O's account and credit B's account with $100.  But suppose O has an account at Bank X, and B has an account at Bank Y.  Unless Banks X and Y are members of the same lending consortium, they must involve a third "intermediary" bank with which Banks X and Y both have accounts.  The transaction would proceed as follows: (1) O instructs Bank X to pay B; (2) Bank X debits O's account and forwards instructions to the intermediary bank; (3) the intermediary bank debits Bank X's account, credits Bank Y's account, and forwards instructions to Bank Y; and (4) Bank Y credits B's account.  The entire process occurs rapidly through a sequence of electronic debits and credits.

Heiser v. Islamic Republic of Iran, 735 F.3d 934, 935–36 (D.C. Cir. 2013).

Here, Wells Fargo was the intermediary bank in an EFT that went as follows:



As set out in the diagram, after receiving the nearly $10 million deposit and Release Instruction from Taif, HFW set into motion the EFT of that amount to Crystal Holdings.  It instructed its bank, Lloyds Bank PLC, to make a payment to Credit Suisse (Switzerland) Ltd. for the benefit of Crystal Holdings.  See No. 21-126, ECF No. 4-1, Exh. D (History Transaction Listing) at 1.  To accomplish that transaction, Lloyds Bank sent a payment order to Wells Fargo, an intermediary

bank at which both Lloyds Bank and Credit Suisse have accounts.  The payment order instructed that Wells Fargo should debit Lloyd Bank's account and credit the account of Credit Suisse.  Id. Credit Suisse would then credit the account of its customer Crystal Holdings.

Best laid plans often go awry, however, particularly when they are illicit and when the U.S. Treasury Department is alerted.  One week before HFW initiated the EFT, Treasury's Office of Foreign Asset Control (OFAC) notified Wells Fargo that it might be "asked to process a transaction crediting the account it maintains for Credit Suisse" for the benefit of Crystal Holdings.  Id., ECF No. 5 at ECF p. 40 (Declaration of Chantale Fiebig, Exh. 1).  OFAC warned that such transaction would be blocked under federal law and that Wells Fargo would be required to suspend and report it.  Id.  In accordance with that instruction, Wells Fargo halted the transfer after debiting the account of Lloyds Bank and prior to crediting the account of Credit Suisse. See History Transaction Listing at 1–2.  Shortly thereafter, OFAC issued blocking memoranda formalizing the blocking of the funds under various sources of law including section 203 of the International Emergency Economic Powers Act, 50 U.S.C. § 1702.  See No. 21-126, ECF No. 4-2, Exh. G. (Blocking Memoranda).  The funds remain held at Wells Fargo.

B.  Procedural History

With a glittering prize of nearly $10 million sitting in limbo, a number of claimants have attempted to seize this bauble, filing myriad lawsuits.  The Court recounts the relevant procedural history of those efforts in the order of when they were commenced.

1.  *Forfeiture Action*

On May 1, 2020, the United States filed a forfeiture action, which was assigned to this Court; its caption notwithstanding, that suit seeks to arrest both the $2.34 million Nautic down payment (held by Crystal Holdings) and the funds at issue here.  See Complaint, United States v.

$2,340,000.00 Associated With Petroleum Tanker Nautic, No. 20-1139, ECF No. 1.  This Court

issued a warrant for arrest *in rem* of both properties that same day.  Id., ECF No. 3.  The

Government subsequently applied for and received an OFAC license, which authorizes it and

Wells Fargo, notwithstanding the blocking orders, to "engage in all transactions necessary and

ordinarily incident to relinquish custody of the Funds" conditional on the Government's

obtaining a valid forfeiture order.  See ECF No. 4-2, Exh. J (OFAC License) at 2.  This litigation,

however, is essentially on ice; the Government has asked the Court to hold it in abeyance until

the validity of the writs of attachment issued to various other plaintiffs have been resolved, as

those interests could also be asserted in the forfeiture action.  Id., ECF No. 10 (Notice of Related

Cases) at 4.

        2.  *Owens* Actions

     In late May 2020, the Owens Plaintiffs, each of whom have unpaid judgments against

Iran dating back to Judge Bates's 2011 decisions, learned through public reporting of the United

States' seizure of the funds at Wells Fargo.  See No. 01-2244, ECF No. 450 (Owens Mot. for

Writ of Attachment) at 4.  Not to be left out, they moved for writs of attachment against the

funds.  Id.; No. 08-1377, ECF No. 159; No. 10-356, ECF No. 110.  Judge Bates, essentially

treating the cases as consolidated, granted those writs shortly thereafter.  See No. 01-2244, ECF

No. 451; No. 08-1377, ECF No. 160; No. 10-356, ECF No. 111.  Plaintiffs in each case then

filed motions to condemn and recover the funds, requesting orders directing Wells Fargo to

deliver them.  See No. 01-2244, ECF No. 464; No. 08-1377, ECF No. 167; No. 10-356, ECF No.

119.

     After learning of the writs, the Government sought (with Plaintiffs' consent) to intervene

in the proceedings, with the object of quashing the writs in order to preserve clean title to the

funds in its forfeiture action.  See, e.g., No. 01-2244, ECF No. 461.  It so moved on August 17,

2020.  Id., ECF No. 473.  Then, as part of a broader effort to consolidate all funds-related

litigation before one judge, the Government moved to sever and reassign the writs proceedings to

this Court (because it presides over the first-filed case involving the funds — viz., the United

States' forfeiture action).  See Owens v. Republic of Sudan, No. 01-2244, 2021 WL 131446, at

*2 (D.D.C. Jan. 14, 2021).  Judge Bates granted that motion, creating three new limited-purpose

actions that were reassigned to this Court.  The pending motions in those cases — the

Government's Motion to Quash and Plaintiffs' Motion to Condemn — are now ripe for decision.

> 3.  *The Levin Actions*

Like the Owens Plaintiffs, the Levin Plaintiffs also learned of the frozen Wells Fargo

funds as a result of the United States' forfeiture complaint and related newspaper articles.  See

Levin Mot. for Writ of Attachment at 5.  Not to be outdone, they then sought to recover the funds

in several distinct proceedings.  On August 11, 2020, they filed an application for a writ of

execution against the funds in the Southern District of New York.  See Application for Writ of

Execution, Levin v. Bank of N.Y., No. 09-5900, ECF No. 1309 (S.D.N.Y. Aug. 11, 2020).  And

on August 19, they sought a writ of attachment in their separate action in this district.  See Levin

Mot. for Writ of Attachment.

As it had in the Owens cases, the Government intervened in both actions and then moved

to transfer and/or reassign them.  The Levin Plaintiffs consented to reassignment in their DDC

case, and Judge Randolph D. Moss sent it here on October 21, 2020.  Per agreement between the

parties, this Court then granted Plaintiffs a writ of attachment without prejudice to the

Government's ability to move to quash.  See No. 05-2494, ECF No. 41.  The Government has

now so moved, raising identical arguments as to the propriety of the writs that it asserts in the

Owens actions.  See No. 05-2494, ECF No. 46 (Levin Mot. to Quash).  That motion too is ripe for resolution.

The Levin action in SDNY has proceeded somewhat differently.  Prior to referring the case to Magistrate Judge Robert W. Lehrburger, presiding Judge J. Paul Oetken granted Plaintiffs a writ of execution against the Wells Fargo funds.  See No. 09-5900, ECF No. 1324 (S.D.N.Y. Sept. 15, 2020).  After the Government moved to intervene, however, both parties jointly stipulated that Wells Fargo has no obligation to turn over the funds pursuant to the writ absent a further court order.  Id., ECF No. 1338 (S.D.N.Y. Oct. 23, 2020).  For reasons unclear to this Court, however, the Levin Plaintiffs opposed transferring the action to this district. Magistrate Judge Lehrburger then denied the Government's transfer motion on January 20, 2021. Id., ECF No. 1361.  The Government has not since moved to quash the writ of execution, although its effect is essentially stayed per the joint stipulation.

Not content with sticking to the east coast, the Levin Plaintiffs also note that they have secured another writ of execution against the Wells Fargo funds from a federal judge in the District of South Dakota.  See Levin v. Islamic Republic of Iran, No. 20-mc-35, Dkt. No. 12 (D.S.D. Dec. 31, 2020).  According to the Levin Plaintiffs, Wells Fargo's counsel has informed them that the funds are actually held at its office in that state.  See No. 05-2494, ECF No. 48 (Levin Opp.) at 3.  It does not appear that the Government has intervened in that proceeding.

\* \* \*

While a reader may be forgiven for inferring that all of these procedural issues render this case a Gordian knot, the legal issues are relatively straightforward.  The ripe issue for decision in all of the proceedings now before this Court is the same — whether private plaintiffs with unsatisfied judgments against Iran may attach and/or execute against the funds currently held at

Wells Fargo.  The United States' forfeiture authority, by contrast, rests on separate and independent questions of law that all agree should not be decided until the various private plaintiffs' claims have been resolved.  The Court, accordingly, proceeds to examine the issue of Plaintiffs' entitlements to the Wells Fargo funds.  (Of course, its decision, at least at this time, has no formal effect on the writs of execution issued in the <u>Levin</u> SDNY or District of South Dakota cases.)

## II.    Legal Standard

Although this Court and Judge Bates have already granted Plaintiffs writs of attachment against the Wells Fargo funds, it is black-letter law that this Court has "inherent power to reconsider an interlocutory order as justice requires."  <u>Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.</u>, 630 F.3d 217, 227 (D.C. Cir. 2011) (cleaned up); <u>see</u> Fed. R. Civ. P. 54(b).  District courts thus "retain broad discretion" to reconsider earlier interlocutory orders and may grant such reconsideration on a number of grounds, including the existence of new arguments or information that "might reasonably be expected to alter the conclusion reached by the court." <u>Cobell v. Norton</u>, 355 F. Supp. 2d 531, 539–40 (D.D.C. 2005) (cleaned up).

Here, because the <u>Levin</u> writ was granted expressly without prejudice to the Government's ability to later oppose it, justice requires the Court to consider the United States' arguments against the propriety of the writ's issuance.  As to the <u>Owens</u> Plaintiffs' writs, justice similarly requires the Court to assess the Government's arguments raised in its Motions to Quash because they were not available to Judge Bates when he granted the writs.  Courts routinely evaluate the validity of writs of attachment *de novo* when faced with motions to quash.  <u>See, e.g.</u>, <u>Bennett v. Islamic Republic of Iran</u>, 618 F.3d 19, 21 (D.C. Cir. 2010) (affirming district court's order granting motion to quash writs of attachment, holding that "[w]hether the properties are

subject to attachment is a question of law that we review de novo") (citation omitted); Stern v. Islamic Republic of Iran, 73 F. Supp. 3d 46, 49–50 (D.D.C. 2014) (granting motion to quash writs of attachment).  In the discussion that follows, furthermore, the Court does not distinguish among Plaintiffs or among suits since the analysis of their ability to attach the funds is the same.

## III.    Analysis

Plaintiffs ground their right to attach and execute upon the Wells Fargo funds in two different federal statutes: the Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297, § 210(a), 116 Stat. 2322, 2337 (2002), and the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1610(a), (g).  The parties trade a number of arguments as to whether these statutes apply to the funds such that Plaintiffs may recover them in aid of their judgments against Iran.  As it turns out, the Court need only address one issue: whether Iran has an attachable interest in the funds under the TRIA or the FSIA.  It does not, and for that reason alone, the writs of attachment are invalid and must be quashed.

### A.  TRIA and FSIA

Section 201(a) of the TRIA subjects to attachment and execution the "blocked assets of" a "terrorist party" judgment debtor.  See Pub. L. No. 107-297, § 201(a).  Subsections 1610(a)(7) and 1610(g) of the FSIA, both of which, according to Plaintiffs, authorize attachment and execution here, apply to "[t]he property . . . of a foreign state."  28 U.S.C. §§ 1610(a), (g)(1) (covering "the property of a foreign state" and "the property of an agency or instrumentality of such a state").  A threshold question, then, is whether the Wells Fargo funds qualify as either "blocked assets" or "the property" of Taif within the meaning of those statutes.  See Heiser v. Islamic Republic of Iran, 735 F.3d 934, 938 (D.C. Cir. 2013) ("Whether plaintiffs can attach the

contested accounts thus depends on whether those accounts are the 'property' or 'blocked assets' of Iran."); accord Levin v. JPMorgan Chase Bank, N.A., 751 F. App'x 143, 147 (2d Cir. 2018).

Although the answer to that question is not exactly intuitive, the D.C. Circuit pointed the way in Heiser. There, the court held that the words "property" and "blocked assets" both require the judgment debtor, here (and there) Iran, to have an ownership interest in the relevant property. See 735 F.3d at 940–41. As for what constitutes a sufficient ownership interest, the Circuit explained that it had to fashion a rule of federal common law in order to implement sections 201 and 1610. Id. at 940. In the context of EFTs, the Court found Article 4A of the Uniform Commercial Code to be "a particularly convenient and appropriate measure of ownership because it has been adopted by all fifty states and the District of Columbia [and because it] addresses ownership of electronic funds transfers." Id.; see id. at 940–41 ("[W]e hold that Article 4A is a proper federal rule of decision for applying the ownership requirements of § 201 and § 1610(g)."). That holding harmonized this Circuit's law with that of the Second Circuit, which has repeatedly applied Article 4A when evaluating terrorism victims' attempts to attach and/or execute upon funds blocked mid-EFT. See Levin, 751 F. App'x at 147; see, e.g., Calderon-Cardona v. Bank of New York Mellon, 770 F.3d 993, 1001–02 (2d Cir. 2014); Hausler v. JP Morgan Chase Bank, N.A., 770 F.3d 207, 212 (2d Cir. 2014).

B.  Application of U.C.C.

Applying Article 4A to the interrupted EFT at issue here (reproduced again below) demonstrates that Iran (via Taif) has no property interest in the funds held at Wells Fargo.



Although the parties dispute whether Taif or HFW is the true originator of the EFT, compare

Owens Mot. to Quash at 17–18, with ECF No. 5 (Owens Opp.) at 10–12, the Court will assume,

as Plaintiffs contend, that Taif is the originator.  Even granting this assumption, however, under

the Article 4A regime, the general rule is that "the only entity with a property interest in an EFT

while it is midstream is the entity immediately preceding the bank 'holding' the EFT in the

transaction chain.  In the context of a blocked transaction, this means that the only entity with a

property interest in the stopped EFT is the entity that passed the EFT on to the bank where it

presently rests." Calderon-Cardona, 770 F.3d at 1002; see Levin, 751 F. App'x at 147–48.  In

the instant EFT, that was the originator's bank — here, Lloyds Bank — not the actual originator,

Taif.  The upshot is that only Lloyds Bank, not Iran, holds an attachable interest in the frozen

funds, and so the funds are not available to satisfy Plaintiffs' judgments against Iran.  Given that

this may appear too simple a resolution, the Court will walk through the analysis in more depth.

At the outset, it is helpful to understand the logic behind the general rule that "ownership

of an EFT blocked by a . . . bank depends entirely on the identity of the immediate transferor to

that bank," Levin, 751 F. App'x at 148, and the corollary that "midstream EFTs held by an

intermediary bank are not the property of . . . the originator."  Estate of Heiser v. Islamic

Republic of Iran, 885 F. Supp. 2d 429, 447 (D.D.C. 2012) (cleaned up), aff'd sub nom. Heiser,

735 F.3d 934.  That is the rule because, as Article 4A's drafters have explained:

> [U]nder the Article 4A structure, the issuance and acceptance of
> payment orders [*i.e.*, the individual transactions constituting an
> EFT] create[] rights and obligations only as between the sender of
> the payment order and its receiving bank (*e.g.*, between originator
> and originator's bank as to the originator's payment order), between
> the originator's bank and an intermediary bank as to the originator's
> bank's payment order, between the intermediary bank and the
> beneficiary bank as to the intermediary bank's payment order, and
> finally, as between the beneficiary bank that has accepted a payment
> order and that beneficiary.

Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 120 (2d Cir. 2010) (quoting

Permanent Editorial Board for the Uniform Commercial Code, Commentary No. 16, §§ 4A-

502(d) and 4A-503, at 2 (2009), https://bit.ly/37I43Ld).  In other words, under the regime

established by Article 4A, every link in the chain of transactions is a stand-alone agreement

between sender and recipient, to be evaluated (save the one exception discussed below) without

regard to the other transactions making up the EFT.  See Receivers of Sabena S.A. v. Deutsche

Bank A.G., 142 A.D. 3d 242, 254 (N.Y. App. Div. 2016) ("It is evident that Article 4-A treats a

funds transfer as a series of individual transactions, each of which involves two parties dealing

directly with each other, or, stated otherwise, as a series of transactions each of which involves

only the parties to the individual payment order.") (cleaned up).

　　　　This approach facilitates the "orderly unraveling of a funds transfer in the event that the

transfer was not completed."  Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 101 (2d Cir.

1998).  Because each link in the chain creates contractual obligations only as to the immediate

sender and/or recipient, if the EFT is interrupted at any point, then "each entity involved in the

transfer can recover only from the entity to which it directly passed the EFT."  Harrison v.

Republic of Sudan, 309 F. Supp. 3d 46, 51 (S.D.N.Y. 2018); see Grain Traders, 160 F.3d at 101

(refund rights under Article 4A-402 "appl[y] only between the parties to a particular payment

order and not to the parties to the funds transfer as a whole").  It is for that reason that "[w]hen a

funds transfer is not completed, the intermediary bank receiving payment" is obligated to refund

payment only to the immediately prior sender (the originator's bank) and has no obligation to the

originator.  United States v. BCCI Holdings (Luxembourg), S.A., 977 F. Supp. 12, 18 (D.D.C.

1997), aff'd, 159 F.3d 637 (D.C. Cir. 1998); see also Asia Pulp, 609 F.3d at 121 ("[A]n

originator . . . ha[s] no legal claim or contractual rights against an intermediary bank in the event

that a funds transfer is not completed."). The originator is instead left to seek a refund from its bank because that is the entity with which it is in contractual privity. Harrison, 309 F. Supp. 3d at 51. Hence the rule repeatedly adhered to in Second Circuit cases such as Levin and Calderon-Cardona: when an EFT is interrupted midstream at the intermediary bank, only the originator's bank, not the originator, has a claim to the funds.

That leaves Plaintiffs here out of luck unless an exception to the rule, set out in U.C.C. Article 4A-402(e), applies to the interrupted EFT at issue. That provision denotes a circumstance in which, by operation of law, the originator "is subrogated to the right of the bank that paid the intermediary bank." For the uninitiated, "subrogation" simply means the "substitution of a person for another regarding a legal right or claim." Subrogate, Black's Law Dictionary (11th ed. 2019) (formatting modified). If subrogation occurs, then notwithstanding the fact that the originator's bank "would normally be the only entity with a property interest in the EFT," "the originator is substituted for the transferring bank and becomes the only entity with a property interest in the held EFT." Harrison, 309 F. Supp. 3d at 51; see also Heiser, 735 F.3d at 941 (explaining that if subrogation occurs, then "claims on an interrupted funds transfer ultimately belong to the originator"); Receivers of Sabena, 142 A.D. 3d at 263 n.20; Nova Mar. B.V.I. Ltd. v. Transvast Shipping Co., No. 08-6869, 2009 WL 4884162, at *2 n.15 (S.D.N.Y. Dec. 16, 2009). What this means here is that if the instant EFT meets the requirements for subrogation, then Taif as the assumed originator would have a claim to the funds that Plaintiffs could attach.

Section 4A-402(e) sets out those requirements:

> If a funds transfer is not completed . . . and an intermediary bank is obliged to refund payment . . . but is unable to do so because not permitted by applicable law or because the bank suspends payments, a sender in the funds transfer that executed a payment order in

15

> compliance with an instruction . . . to route the funds transfer
> through that intermediary bank is entitled to receive or retain
> payment from the sender of the payment order that it accepted. The
> first sender in the funds transfer that issued an instruction requiring
> routing through that intermediary bank is subrogated to the right of
> the bank that paid the intermediary bank to [a] refund . . . .

Readers without a finance background should not despair, as this provision is simpler than its language might suggest. In essence, it allows the originator and the originator's bank to decide which of them should bear the risk of loss if the EFT fails and the intermediary bank is unable to refund payment. Under the default rules discussed above, the originator's bank would bear the risk: it would owe a refund to the originator and be left with a worthless refund claim against the intermediary, which cannot pay it. Section 402(e), however, allows the parties to arrange the transaction such that the originator instead bears the risk — via subrogation. Specifically, if the originator "issue[s] an instruction requiring routing through [a specific] intermediary bank," and the originator's bank follows that instruction and uses that intermediary for the EFT, then the originator essentially switches places with its bank. See U.C.C. § 4A-402(e). The originator ends up with the unlikely-to-be-satisfied refund claim against the intermediary, and the originator's bank gets to keep the originator's money that it debited during the EFT, offsetting the loss of funds it transferred to the intermediary bank. The idea is to "allocate[] th[e] risk of loss to the party that first designated the failed bank to be used in the transfer." Grain Traders, 160 F.3d at 102. In other words, the one who chooses loses.

It is clear in our circumstances that section 402(e)'s subrogation requirements are not met and that therefore Lloyds Bank, not Taif, still holds the refund claim against Wells Fargo. Here, interestingly enough, Taif's instruction that HFW should commence the EFT did include a direction to use a particular intermediary bank, Bank of New York Mellon. See Release Instruction. For some unknown reason, however, Lloyds used Wells Fargo instead. Lloyds

therefore did not "execute[] [the] payment order in compliance with an instruction . . . to route

the funds transfer through [the] intermediary bank" that the originator (assuming it was Taif) had

selected.  See U.C.C. § 4A-402(e).  Taif, accordingly, is not subrogated to Lloyds's right to a

refund from Wells Fargo.

 To be clear, neither the Levin nor Owens Plaintiffs maintain that the EFT at issue here

satisfies the U.C.C.'s requirements for subrogation.  Their only argument on this score is one of

law, not of fact — viz., that the D.C. Circuit in Heiser interpreted section 4A-402 to mean that an

originator is always subrogated to the refund right of the originator's bank whenever the EFT is

interrupted midstream.  See Owens Opp. at 12–13; Levin Opp. at 19–20.

 This is not accurate.  It is admittedly true that Heiser described U.C.C. § 4A-402(e), in

dicta, without naming every one of its requirements for subrogation.  The court simply stated, "If

the intermediary bank is prohibited from completing a transfer, then the originator is subrogated

to its bank's right to a refund."  735 F.3d at 941.  But it is absurd to read that one sentence as sub

silentio revolutionizing the subrogation provision, transforming it from a risk-allocating tool into

a categorical protection for originator banks (and only in the D.C. Circuit, to boot).  The whole

point of Heiser was that "Article 4A is a proper federal rule of decision for applying the

ownership requirements of § 201 and § 1610(g)" because courts universally apply it to that issue.

Id. at 940–41.  And section 402(e) has been consistently interpreted as causing subrogation only

where the originator designates the intermediary bank that was in fact used — unsurprisingly,

given that its plain text very clearly sets out that condition.  This Court will abide by that obvious

meaning.

 The upshot is that Iran has no interest in the Wells Fargo funds that qualifies as attachable

or condemnable under the TRIA or FSIA.  Even assuming Taif was the originator, it was not the

entity that most immediately passed the EFT to Wells Fargo — that entity was Lloyds Bank —

nor was it subrogated by U.C.C § 4A-402(e) to Lloyds's right of recovery.  The writs of

attachment granted to Plaintiffs must therefore be quashed, and the <u>Owens</u> Plaintiffs' Motions to

Condemn the funds denied.

**IV.     Conclusion**

   For the foregoing reasons, the Court will grant the Government's Motions to Quash the

writs of attachment in Nos. 05-2494, 21-126, 21-127, and 21-128.  The Court will also deny the

Plaintiffs' Motions to Condemn the funds in Nos. 21-126, 21-127, and 21-128.  A

contemporaneous Order so stating shall issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>March 4, 2021</u>